## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: _____

| | |
|---|---|
| THE DEMOCRATIC REPUBLIC OF THE CONGO | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| AIR CAPITAL GROUP, LLC,  MARIO ABAD, individually, and JAIME SANCHEZ, individually, and COMMERCIAL JET, INC. | : |
| | : |
| | : |
| | : |
| Defendants. | : |
| _____ | : |

## COMPLAINT

Plaintiff, the Democratic Republic of the Congo, by and through its undersigned counsel, avers as follows:

## THE PARTIES

1.      Plaintiff, the Democratic Republic of the Congo (hereinafter the "DRC") is a foreign country.

2.      Defendant, Air Capital Group, LLC ("ACG") is a Florida limited liability company with a principal place of business at 6355 Northwest 36th Street, Suite 508, Miami, FL 33166-7027.

3.      Defendant, Mario Abad  is an individual over the age of eighteen who  resides in Miami-Dade County, Florida.  Mr Abad is the Chief Executive Officer of ACG.

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

4.      Defendant, Jaime Sanchez is an individual over the age of eighteen who resides in Miami-Dade County, Florida.  Mr. Sanchez is the President of ACG.  Defendants, ACG, Mr. Abad and Mr. Sanchez are sometimes referred to herein collectively as the "ACG Defendants."

5.      Defendant, Commercial Jet, Inc. ("Commercial Jet") is a Florida corporation with a principal place of business at 4600 NW 36 Street, Building 896, Miami, FL 33166.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(4) as this action is between a foreign state and citizens of a state and the amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

7.      This Court has personal jurisdiction over ACG, Commercial Jet, and Messrs. Abad and Sanchez in that ACG and Commercial Jet are organized under Florida law and maintain their principal place of business in Florida, and Messrs. Abad and Sanchez are Florida residents.

8.      Venue is proper in this district pursuant to 28 U.S.C. §1391 as the defendants reside in this district, the events and omissions giving rise to the claims at issue occurred within this district, and the defendants are subject to personal jurisdiction within this district.

## FACTUAL ALLEGATIONS

9.      This lawsuit arises from fraud and unfair trade practices committed by ACG and two of its officers and principals, Messrs. Abad and Sanchez, in connection with repairs to Aircraft B707-138B with registration 9Q-CLK and serial #17702 ("the Aircraft") in Florida. The ACG Defendants arrogantly believed that representatives of the DRC were unsophisticated, and located so far away from Miami, that the ACG Defendants could get away with overcharging the DRC millions of dollars without the DRC discovering their fraud.   As set forth in detail below,

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01213

the DRC was first fraudulently induced to enter into an agreement with ACG for repairs to the Aircraft, then the ACG Defendants flagrantly over-billed the DRC and in some cases billed the DRC for equipment not actually put on the Aircraft or work not actually performed on the Aircraft, and finally when the DRC started to question charges actually created false invoices and altered others to cover up their fraud.

10.      Representatives of the DRC and ACG first met in June of 2010 in Kinshasa in the DRC.  Messrs. Abad and Sanchez, who purported to be in the DRC on other business, met with Charles Deschryver, a representative of the DRC, to discuss the possibility of ACG performing maintenance work on the Aircraft.  Mr. Abad and Mr. Sanchez expressly represented to Mr. Deschryver that ACG would do the maintenance work on the Aircraft and its engines at <u>ACG' s own</u> Miami maintenance, repair and overhaul facility and its engine repair shop.

11.      Subsequent to the meeting, Mr. Deschryver requested that Messrs. Abad and Sanchez inspect the Aircraft and confirm that they could indeed perform the work on the Aircraft and its engines.  Messrs. Abad and Sanchez met Mr. Zacharie Nankwaya, another representative of the DRC, at the airport, purported to inspect the Aircraft, and expressly confirmed to Mr. Nankwaya that the Aircraft was in a condition that would allow ACG to successfully perform the requested work on the Aircraft, a 4C-Check and lower checks, as well as certain other repairs and installations.

12.      After the inspection, Messrs. Abad and Sanchez requested that Mr. Nankwaya provide them technical and other information relating to the prior maintenance of the Aircraft so that ACG could provide the DRC with a specific quote for the maintenance work ACG would perform on the Aircraft.  Additionally, Messrs. Abad and Sanchez requested Mr. Nankwaya provide information about the engines on the Aircraft so that ACG could provide a separate

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01214

quote for the work ACG proposed it would perform on the engines. On or about June 9, 2010, Mr. Nankwaya sent to Messrs. Abad and Sanchez in Florida all of the information they had requested.

13.     On or about June 23, 2010, Mr. Abad sent to Messrs. Deschryver and Nankwaya from Florida a proposed workscope agreement dated June 21, 2010, which purportedly covered the maintenance work that ACG said it could provide on the Aircraft. In the electronic correspondence forwarding the proposed workscope agreement, Mr. Abad specifically stated that the Aircraft would be serviced "at both *our* facilities in Miami, the MRO [maintenance, repair and overhaul facility] and the engine repair shop." (emphasis added).

14.     On the same date, separate from the work covered by the workscope agreement, Mr. Abad represented in an electronic correspondence sent from Florida to Messrs. Deschryver and Nankwaya that ACG could perform the necessary work on the Aircraft's engines for $190,000.00 per engine for a total of $760,000.00 for the four engines on the Aircraft. ACG via Mr. Abad represented to Messrs. Deschryver and Nankwaya that after the performance of this work each of the engines would have 14 years of useful life.

15.     Additionally, also separate and apart from the work covered by the workscope agreement, ACG, via Mr Abad expressly represented to Messrs. Deschryver and Nankwaya in an electronic correspondence sent from Florida that ACG could install Stage III Hush Kits on the Aircraft for an additional $1,350,000.00.

16.     Unfortunately, each of the representations made by ACG and Messrs. Abad and Sanchez to the DRC detailed above were false, as the DRC would later learn.

17.     On or about July 10, 2010, Mr. Deschryver, on behalf of the DRC, and in reliance on the representations made by ACG via Messrs. Abad and Sanchez detailed above, executed the

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01215

workscope agreement dated June 21, 2010 (hereinafter "Agreement").  A true and correct copy of the Agreement is attached hereto as **Exhibit A**.  The DRC was never provided, and does not have in its possession, the additional appendices/documents referenced in the Agreement.  Although the Agreement in a few instances makes references to Commercial Jet, based on the prior misrepresentations made by ACG that they would be performing work on the Aircraft, the DRC understood that either the Aircraft was simply being housed at the Commercial Jet facility or that Commercial Jet was the repair station arm of ACG.  Indeed, the Agreement specifically contemplates that the work on the Aircraft will be accomplished "in-house" except for certain "outside services" which were to be billed at the cost plus 15%.  *See* **Exhibit A**.

18.     On or about July 31, 2010, the DRC delivered the Aircraft to Miami to the care of ACG.  Engines serial numbers 667827 and 643273 on the Aircraft were rejected by ACG, for *inter alia*, issues relating to their historical records (although ACG had purportedly previously reviewed the records).

19.     Consequently, rather than repair these engines as previously agreed, ACG, through Mr. Abad, convinced Mr. Deschryver that two additional engines needed to be purchased.  Mr. Deschryver agreed to go forward with such a purchase based on Mr. Abad's express representation from Florida that he could purchase two engines with full QEC (quick engine exchange kits) and an updated Airworthiness Directive ("AD") corrosion note (resulting in 14 years of engine life) at a price of $250,000.00 each.   Subsequently, the price charged to the DRC by ACG in Florida was increased to $318,000 per engine.

20.     However, as detailed below, the DRC would later learn that in order to try to pocket most of the money charged for the replacement engines, and contrary to the authorization received from the DRC, ACG purchased two QEC engines delivered in Douglas DC-8

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01216

configuration, which did not have the 14 year life requested by the DRC and needed to be reconfigured so they could fit the Aircraft. Interestingly, ACG charged the DRC for the QECs delivered with the engines, but kept the QECs for ACG's own use.

21. From the date on which the Aircraft was first delivered to ACG through the end of December 2010, ACG via Messrs. Abad and Sanchez continually assured Messrs. Deschryver and Nankwaya numerous times in electronic correspondence sent from Florida and telephone calls made from Florida that the maintenance work under the Agreement was proceeding as planned and repeatedly requested payment. Further, ACG also requested via electronic correspondence and telephone calls from Florida payment for the work relating to the installation of the Stage III Kits and in connection with the engines.

22. As a result of ACG's requests and false assurances, by December 31, 2010, the DRC had paid to ACG in Florida a total of $5 million.

23. On or about January 3, 2011, under pressure from the DRC regarding their overdue Aircraft, ACG via Messrs. Abad and Sanchez represented to Messrs. Deschryver and Nankwaya in electronic correspondence forwarded from Florida that the work on the Aircraft and the engines should be completed in short order.

24. Accordingly, in reliance on ACG's representations that the Aircraft and engines would soon be complete, Mr. Nankwaya and Mr. Jean Mpunga, also of the DRC, traveled to Miami to inspect the Aircraft. When they arrived in Miami, Messrs. Nankwaya and Mpunga discovered that the Aircraft and engines were not actually ready nor even close to being ready.

25. During their January 2011 visit, Messrs. Nankwaya and Mpunga also realized that the Stage III kits -- which the DRC had already paid $1,350,000.00 for -- were not installed on the Aircraft, contrary to ACG's specific representations.

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01217

26.     At this point, during the same visit, representatives of the DRC also realized for the first time that all of the work that had actually been performed on the Aircraft had been performed by persons other than ACG, contrary to the representations made by ACG to induce the DRC to enter into the Agreement.

27.     Finally, during this visit, representatives of the DRC also realized that the replacement engines purchased by ACG, were not in accordance with the DRC's authorization (*i.e.* QEC engines for this particular type of Boeing aircraft), and instead the engines purchased were Douglas configuration DC-8 engines (engines 645402 and 669706) that needed to be converted to Boeing configuration engines to work on the Aircraft.  In addition, the Douglas QECs on the engines purchased by ACG did not work on the Aircraft.  The DRC requested ACG provide the technical information and records for the two replacement engines, which information and records was not provided during the January 2011 visit.  In fact, ACG continued to ignore the many questions posed by the DRC or mislead the DRC through further misrepresentations.

28.     For example, in April 2011, ACG informed Mr. Deschryver in electronic correspondence sent from Florida that Bonus Aerospace, LLC had filed a lien of $147,861.42 for unpaid work performed on engine S/N 645744.  In May 2011, ACG informed Mr. Deschryver in electronic correspondence sent from Florida that Commercial Jet was preparing to file a lien on the Aircraft for unpaid work, that the DRC "need to take this matter with the utmost seriousness or the aircraft may be lost," and that ACG's other vendors were also demanding payment for outstanding invoices and requested payment.  ACG did not provide any accounting of the $5 million the DRC had already paid ACG (far in excess of what had been agreed to), but simply

DRC01218

continued to claim that the DRC must pay additional monies or it would lose its Aircraft and engines.

29.     Under duress and relying on ACG's claims that the Aircraft and engines would be lost, the DRC paid to ACG in Florida an additional $1,381,531.64.

30.     In light of the above irregularities that the DRC had begun to discover, on or about May 27, 2011, Messrs. Ben Kalala and Nankwaya returned to Miami to follow up on the progress of the Aircraft and the engines and to perform a financial and technical audit of the work performed on the Aircraft and the engines.

31.     Despite numerous requests, ACG refused to provide Messrs. Kalala and Nankwaya with all of the information they requested so they could conduct the financial and technical audit.  Much of the information that ACG provided lacks any supporting detail for the charges incurred.

32.     In addition, under pressure from representatives of the DRC to explain how the $6,381,531.64 that had been paid by the DRC had been spent, it appears that ACG actually fabricated or altered invoices supposedly received from the other entities that performed work on the Aircraft to hide their flagrant over-billing.  For instance, close review of the documents provided by ACG to representatives of the DRC in Florida, revealed, *inter alia,* (i) multiple invoices supposedly from the third-parties that had done work on the Aircraft with the same invoice number, the same date, and for the same work, but for varying amounts of money (*i.e,* ACG was inflating the amounts on the invoices); and (ii) charges for work and materials not actually provided in connection with the Aircraft.

33.     After arriving to Miami in May 2011, in addition to requesting information necessary to perform an audit, Messrs. Kalala and Nankwaya requested the two replacement

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01219

engines that ACG had purchased be inspected. During inspection of the engine records from the last shop visit, the DRC learned, *inter alia*, that parts of the engines were replaced without the appropriate tags, that A.D. 96-23-10 was not applied to the engines as Messrs. Abad and Sanchez had represented and the engines were not of the quality that had been represented.

34. Indeed, during the flight test in September of 2011, one of the replacement engines, engine serial no. 645402, flamed out, *i.e.* stopped working during operation. The engine was sent back to the engine shop for inspection, repair and testing, which revealed, *inter alia,* the engine had extensive corrosion and was certainly not of the quality requested by the DRC. Consequently, the DRC rejected the engine.

35. The other replacement engine purchased by ACG was equally flawed (669706). In addition to the fact that the engine was not of the type and did not have A.D. 96-23-10 applied as ACG had represented, ACG was not able to provide any of the necessary records for this engine that the DRC had been requesting since early 2011, literally rendering it worthless. Consequently, the DRC also rejected this engine. Several weeks after this engine was rejected by the DRC, ACG claimed to have suddenly found the records with respect to the engine. Even putting aside the other problems with this engine, and assuming the newly "discovered" records were valid and complete, by the time the records were discovered, the DRC had already been forced to contract with another entity for the purchase of appropriate engines in an effort to finally have the work on its Aircraft completed.

36. As a result of the numerous irregularities detailed above, the DRC hired an outside professional to inspect the records with respect to the work performed on the Aircraft. This inspection revealed numerous problems, including numerous deficiencies in the required

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01220

paperwork.  For example, although the DRC paid for installation of the RVSM in accordance with a supplemental type certificate ("STC"), no such STC was obtained by ACG.

37.     On December 26, 2011, the DRC received from Mr. Sanchez an electronic correspondence titled "status report" (again from Florida) in which he falsely claimed, *inter alia,* that the DRC still owed ACG $185,878.70, although Mr. Sanchez graciously offered the DRC the option of a credit in the amount of $318,000.00 in light of the fiasco with the two replacement engines purchased by ACG, although at the time the correspondence was written the records with respect to engine 669706 had not yet been discovered.  Obviously, this credit amount, although wholly insufficient in light of the monies already paid to ACG would have left a credit balance in favor of the DRC.  Mr. Sanchez also claimed that "our company will provide you with a summary of the work and costs related to the Aircraft, including the open balance that is still owed to ACG for money that ACG has paid on behalf of the DRC."  To date, the promised summary has not been forthcoming.

38.     In light of the numerous misrepresentations and misconduct by ACG and Messrs. Abad and Sanchez detailed above, the DRC sought to work directly with Commercial Jet to finish the remaining work still outstanding on the Aircraft.  Commercial Jet is the Florida entity, apparently unaffiliated with ACG, which the DRC came to learn had actually performed most of the work on the Aircraft pursuant to a contract between ACG and Commercial Jet.  Indeed, the contract between ACG and Commercial Jet is nearly identical to the Agreement between ACG and the DRC.  ACG apparently took the contract between Commercial Jet and ACG, changed the names of the parties, and added more than one million dollars, approximately eighty-three percent (83%), to the contract price for "Total Flat Rate for Labor Items A B, C, D, & E.," never

– 10 –
COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01221

disclosing to the DRC that ACG was not itself going to perform any of the work on the Aircraft and was merely serving as some sort of "broker."

39.    Incredibly, ACG has refused to allow Commercial Jet to work directly with the DRC to finish the Aircraft and threatened to lien the Aircraft, even though the Aircraft is not in ACG's possession and even though ACG is certainly not owed any money for services in connection with the Aircraft.  The DRC believes this is a tactic employed by ACG because it knows that the DRC is in desperate need of the Aircraft and believed that the DRC would simply waive all of the claims set forth herein in order to recover possession of the Aircraft.

40.    Commercial Jet has possession of the Aircraft and is unwilling to deal directly with the DRC in connection with finishing the work on the Aircraft without express written permission from ACG since it contracted with ACG.  As alleged, ACG has refused to provide this permission.

41.    Commercial Jet has represented to the DRC that ACG owes it over $300,000 for work previously performed on the Aircraft and is unwilling to give up possession of the Aircraft until this outstanding amount is paid.  Apparently, ACG has simply been pocketing most of the approximately $6.4 million the DRC has paid ACG.

42.    Bottom line,  although the work under the Agreement was to be performed within an estimated 47 calendar days from the date of delivery of the Aircraft in Florida for a total flat rate for labor items of $2,255,872.30, the DRC has now been without its Aircraft for more than 18 months, has paid ACG approximately $6.4 million, has been forced to have representatives in Florida since May of 2011, and incredibly the DRC still does not have possession of its Aircraft, its Aircraft has not been properly repaired and some repairs have not been performed at all, and its Aircraft is missing two out of four engines.

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01222

## COUNT I- FRAUD IN THE INDUCEMENT
### (AGAINST ACG, ABAD, AND SANCHEZ)

43.     The DRC incorporates by reference the averments of paragraphs 1-42 as if fully set forth herein.

44.     Prior to entering into the Agreement, ACG through Messrs. Abad and Sanchez expressly represented to Charles Deschryver and Zacharie Nankwaya, representatives of the DRC, that ACG itself would be performing work on the Aircraft pursuant to the Agreement.

45.     At the time these misrepresentations were made, ACG and Messrs. Abad and Sanchez knew that these statements were false.  ACG is not an FAA certified repair station and is not itself in the business of repairing Aircraft.  ACG never informed the DRC that it would not perform any work itself and would simply serve as some type of "broker" in arranging for other entities to perform work on the Aircraft.  Certainly ACG never disclosed to the DRC that the Agreement is virtually identical to an agreement between ACG and Commercial Jet with respect to repairs to the Aircraft and that ACG simply changed the names of the parties and added more than a million dollars ($1,023,282.30) to the contract price reflected for "Total Flat Rate for Labor Items A B, C, D, & E."

46.     The ACG Defendants intentionally made the misrepresentations and omissions of material fact alleged above in order to induce the DRC to enter into the Agreement.  The DRC would never have knowingly agreed to pay the ACG more than a million dollars simply for arranging to contract the entirety of the work covered in the "Total Flat Rate for Labor Items A B, C, D, & E" to a third party.

47.     The DRC suffered injury in justifiable reliance on ACG's affirmative misrepresentations and omissions.   These injuries include, but are not limited to, the $1,023,282.30 that ACG added to the price ACG was charged by Commercial Jet for the work covered in the "Total Flat Rate for Labor Items A B, C, D, & E".

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01223

**WHEREFORE**, the DRC demands judgment in its favor and against Defendants, ACG, Abad, and Sanchez for compensatory and punitive damages, together with interest, costs and such other relief as this Court deems just and appropriate.

### COUNT II- BREACH OF CONTRACT
### (AGAINST ACG)

48.     The DRC incorporate by reference the averments of paragraphs 1-42 as if fully set forth herein.

49.     As set forth in detail above, after inducing the DRC to execute the Agreement, ACG proceeded to flagrantly breach the Agreement.

50.     Specifically, pursuant to the terms of the Agreement, ACG agreed to perform certain work at a flat price, and certain "over and above work" at specified hourly rates, and to charge for certain materials and "outside" services at cost plus 15%.  *See* Exhibit A. The work covered by the Agreement included a 4C check and lower checks, implementation of certain airworthiness directives, SSID, CPCP, RVSM STC kit installation, and repainting the Aircraft. *See* Exhibit A.  Pursuant to the terms of the Agreement, all of this work was to be completed in "approximately 47 calendar days after induction, pending any major findings."  *See* Exhibit A.

51.     ACG has breached the Agreement in multiple ways including, but not limited to, because it: (i) failed to perform in-house any of the work covered by the Agreement; (ii) failed to have completed the work covered by the Agreement, (iii) failed to obtain the required STCs, including for the RVSM, and other required paperwork necessary for valid installations; (iv) failed to charge the DRC amounts in compliance with the terms of the Agreement and instead flagrantly overcharged the DRC; (v) failed to have installed new or overhauled equipment or parts for which it charged the DRC and instead had installed lower quality equipment and parts; and (vi) failed to return possession of the Aircraft to the DRC to date, let alone within the specified 47 calendar day period.

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

52.     The DRC fully complied with all material terms of the Agreement and has actually far overpaid ACG.

53.     The DRC has suffered damages as a result of ACG's multiple breaches of the Agreement.

**WHEREFORE**, the DRC demands judgment in its favor and against Defendant ACG for its damages, together with interest, costs and such other relief as this Court deems just and appropriate.

## COUNT III—FRAUD
### (AGAINST ACG AND ABAD RELATING TO THE REPLACEMENT ENGINES)

54.     The DRC incorporate by reference the averments of paragraphs 1-42 as if fully set forth herein.

55.     As alleged above, separate and apart from the work covered by the Agreement, ACG, via Mr. Abad, expressly represented to Charles Deschryver, a representative of the DRC, that ACG would purchase two replacement engines with full QEC (quick engine exchange kits) and 14 years of remaining life by virtue of an AD corrosion update at a price of $250,000.00 each. Subsequently, the price charged to the DRC was increased to $318,000 per engine.

56.     At the time this representation was made, ACG and Mr. Abad had no intention of purchasing replacement engines of the type, quality, and with the characteristics specified above, and knew the representation was false.  ACG and Mr. Abad intended to defraud the DRC by purchasing cheap, low quality engines, and pocketing most of the money paid by the DRC, regardless of the flight safety issues created by their fraud.

57.     ACG and Mr. Abad intended to induce the DRC to rely on the misrepresentation.

58.     The DRC relied on the misrepresentation alleged above and paid ACG $636,000.00 for the purchase of two appropriate replacement engines with full QEC and an AD corrosion update.

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01225

59.     The DRC has been damaged by the payment it made in justifiable reliance upon the representations of ACG and Mr. Abad.  Specifically, as alleged in more detail above, the two replacement engines actually purchased by ACG are essentially worthless, and certainly not of the type, quality, and with the characteristics represented by ACG and Mr. Abad and accordingly were rejected by the DRC, and the ACG refused to either return the funds or actually purchase appropriate replacement engines.

**WHEREFORE**,  the DRC demands judgment in its favor and against Defendants ACG and Abad for compensatory and punitive damages, together with interest, costs, and such other relief as this Court deems just and appropriate.

<u>**COUNT IV—FRAUD**</u>
**(AGAINST ACG and ABAD RELATING TO THE STAGE III HUSH KITS)**

60.     The DRC incorporate by reference the averments of paragraphs 1-42 as if fully set forth herein.

61.     As alleged above, separate and apart from the work covered by the Agreement, ACG, via Mr. Abad, represented that ACG would install Stage III Hush Kits on the Aircraft for an additional $1,350,000.00.  Indeed, ACG, via Mr. Abad, actually later assured the DRC that Stage III Husk Kits *had been installed* on the Aircraft.

62.     At the time these representations were made, ACG and Mr. Abad had no intention of purchasing and installing Stage III Husk Kits for the Aircraft and simply intended to steal the money.

63.     ACG and Mr. Abad intended to induce the DRC to rely on the misrepresentation.

64.     The DRC relied on the misrepresentation alleged above and paid ACG $1,350,000.00 for the purchase and installation of Stage III Husk Kits.

65.     The DRC has been injured as a result of the payment it made in justifiable reliance upon the misrepresentations of ACG and Mr. Abad alleged above.  Specifically, after

- 15 –

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01226

the DRC inspected the Aircraft and discovered that the Stage III Husk Kits had not actually been installed and demanded return of its money, ACG has refused to return the $1,350,000.00. Rather, in further continuance of fraud, ACG falsely contends that it has provided the DRC a credit against other monies owed by the DRC to ACG, all the time refusing to perform an accounting of the approximately $6.4 million in has been paid by the DRC.  Again, in reality, ACG and Mr. Abad have simply stolen the money charged for Stage III Husk Kits.

**WHEREFORE**,  the DRC demands judgment in its favor and against Defendants ACG and Mr. Abad for compensatory and punitive damages, together with interest, costs, and such other relief as this Court deems just and appropriate.

### COUNT V—VIOLATION OF FLA. STAT. § 501.201, *ET SEQ.* (AGAINST ACG, ABAD, AND SANCHEZ )

66.    The DRC incorporate by reference the averments of paragraphs 1-65 as if fully set forth herein.

67.    As alleged above, the DRC purchased aircraft repair and overhaul services, from ACG, a Florida entity, that were to be performed in Florida.

68.    As alleged above, the ACG Defendants, *inter alia,* first fraudulently induced the DRC to enter into the Agreement, flagrantly violated the Agreement in multiple ways once it was executed, and, separate and apart from the Agreement, have defrauded the DRC with respect to, *inter alia,* the replacement engines and the hush kits.  In addition, as the numerous irregularities detailed above began to surface, the ACG Defendants, in attempt to cover up their fraud, provided the DRC with invoices purportedly from third parties which appear to be either entirely fabricated or at least altered.

69.    The conduct alleged above constitutes unfair and deceptive trade practices pursuant to Fla. Stat. § 501.201, *et seq.*.  By any definition, the ACG Defendants' conduct alleged above is unscrupulous and unethical.

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01227

70. As alleged above, the ACG Defendants' unfair and deceptive trade practices have caused the DRC significant actual damages. The DRC has paid ACG approximately $6.4 million and yet the Aircraft is in a worse condition than when first delivered to the ACG and is missing two out of four engines.

**WHEREFORE** , the DRC demands judgment in its favor and against Defendants ACG Abad and Sanchez for its actual damages, together with interest, costs, attorney's fees pursuant to Fla. Stat. § 501.2105, and such other relief as this Court deems just and appropriate.

### COUNT VI—WRIT OF REPLEVIN
### (AGAINST COMMERCIAL JET )

71. The DRC incorporate by reference the averments of paragraphs 1-42 as if fully set forth herein.

72. The Aircraft, the B707-138B with registration 9Q-CLK and serial #17702 as defined above, is located at the Commercial Jet facility located at 4600 NW 36 Street, Building 896, Miami, FL 33166 in Miami-Dade County, Florida. To the best of the DRC's knowledge and belief, the Aircraft is worth in excess of one million dollars ($1,000,000.00).

73. The DRC is entitled to possession of the Aircraft. Legal title to the Aircraft rests in the name of the President of the DRC and his family. Per oral agreement with the President, the DRC has the legal right to utilize the Aircraft to transport the President and thus, as alleged in detail above, contracted with ACG for the repair of the Aircraft and has expended approximately $6.4 in connection with the repair of the Aircraft, its engines, and in connection with certain purported installations on the Aircraft.

74. The Aircraft is being wrongfully detained by Commercial Jet, which obtained physical possession of the Aircraft by virtue of an agreement between Commercial Jet and ACG.

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01228

75.     As alleged at length above, the DRC had no knowledge that the ACG had contracted with Commercial Jet to perform all of the repairs set forth in the Agreement included within "Total Flat Rate for Labor Items A B, C, D, & E" and, instead, based on the express representations of ACG believed ACG would perform work on the Aircraft itself.  The DRC has already paid ACG far more than the costs of all the repairs and other work performed on the Aircraft, including for the work apparently performed by Commercial Jet.

76.     The DRC is not in contractual privity with Commercial Jet and wishes to have its Aircraft returned to it so that it may finally have finished the necessary repairs to the Aircraft, including, *inter alia,* the necessary installation of two out of four engines.

77.     Commercial Jet has been informed by the DRC that the DRC is the party validly entitled to possession of the Aircraft, not ACG.  However, because of a contractual dispute between Commercial Jet and ACG having nothing to do with the DRC, Commercial Jet has refused to turn over possession of the Aircraft to the DRC.

78.     It is extremely unjust for the DRC -- which again has already paid ACG millions of dollars in excess of the costs of repairs and other work performed on the Aircraft -- to continue to be without possession of its Aircraft which, again, is urgently needed to transport the President of the DRC.

79.     The Aircraft has not been taken for a tax assessment or fine pursuant to law.

80.     The Aircraft has not been taken under an execution or attachment against the property of the DRC.

**WHEREFORE**, the DRC demands a writ of replevin ordering that the Aircraft be returned to the possession of the DRC and its damages for loss of use of the Aircraft during the time-period it has wrongfully been retained by Commercial Jet, and such other relief as this Court deems just and appropriate.

- 18 –

DRC01229

## DEMAND FOR JURY TRIAL

The DRC demands a jury trial on all issues so triable.


Dated:    02/14/2012

                                    Respectfully submitted,

                                    **COZEN O'CONNOR**
                                    *Attorneys for Canine Narcotic Intervention, Inc.*
                                    Suite 4410
                                    200 South Biscayne Boulevard
                                    Miami, Florida 33131-4332
                                    Telephone:  (305) 704-5940
                                    Facsimile:  (305) 704-5955


                                    By     Richard M. Dunn
                                        Richard M. Dunn
                                      Fla. Bar. No.: 126953
                                      rdunn@cozen.com
                                      Raquel Fernandez
                                      Fla. Bar. No.: 55069
                                    rfernandez@cozen.com
                                    Jermaine A. Lee
                                      Fla. Bar No.: 0850861
                                    jalee@cozen.com

COZEN O'CONNOR
200 South Biscayne Boulevard, Suite 4410, Miami, Florida 33131 – Telephone 305-704-5940 – Facsimile 305-704-5955
MIAMI\135305\2 316374.000

DRC01230