UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20607-CIV-ROSENBAUM/SELTZER

DEMOCRATIC REPUBLIC OF THE CONGO,

    Plaintiff,

vs.

AIR CAPITAL GROUP, LLC, *et al.*,

    Defendants.
_____/

## ORDER DENYING DEFENDANTS AIR CAPITAL GROUP'S AND MARIO ABAD'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court upon Defendants Air Capital Group's and Mario Abad's Motion for Summary Judgment [D.E. 86]. The Court has reviewed the parties' briefs and statements of material facts and the evidence on the record and is otherwise fully informed in this matter. For the reasons set forth below, the Court denies Defendants' Motion for Summary Judgment.

## I. MATERIAL FACTS

This case arises out of a contract and related representations between Plaintiff Democratic Republic of the Congo ("DRC") and Defendant Air Capital Group, LLC, ("ACG") to perform extensive work on an airplane owned by Plaintiff DRC. According to the DRC, Defendant ACG and its officers falsely stated their capabilities to perform the work, made other misrepresentations, and failed to provide the services to which the parties allegedly agreed in the contract.

Defendant Mario Abad is the Chief Executive Officer of Defendant ACG, a Florida limited-liability company. In June 2010, Abad, along with Co-Defendant Jaime Sanchez (the President of

ACG), attended a meeting with Charles Deschryver in Kinshasa, DRC. D.E. 79, ¶ 22; D.E. 105, ¶ 22.[1] Deschryver, a representative of the DRC, D.E. 105, ¶6, was introduced to ACG and Abad by Stavros Papaioannaou, co-owner of Hewa Bora airlines, who was also present at the June 2010 meeting. D.E. 79, ¶ 22; D.E. 86, ¶¶ 3, 5; D.E. 105, ¶ 22; D.E. 106, ¶¶ 3, 5. During the meeting, Deschryver asked Abad if would be able to repair and refurbish the Boeing 707 aircraft ("Aircraft") at the center of this lawsuit. D.E. 79, ¶ 22; D.E. 105, ¶ 22.

During the June 2010 meeting, Papaioannaou told Deschryver that ACG had a repair facility in Miami. D.E. 86, ¶ 5. Deschryver then asked Abad if ACG owned a maintenance, repair, and overhaul ("MRO") facility and could perform the requested work on the Aircraft. *Id.* Abad confirmed that ACG did own such a facility. *Id.* During this meeting, Sanchez said nothing regarding ACG's ownership of an MRO or its ability to perform the work. D.E. 79, ¶ 22; D.E. 105, ¶ 22. It is undisputed that ACG does not have an MRO facility and is itself not authorized to perform the type of work contemplated by the parties. D.E. 79, ¶ 14; D.E. 105, ¶ 14.

Following this meeting, on June 21, 2010,[2] Abad and Deschryver executed a "Workscope Agreement" for the repair and refurbishment of the Aircraft. *See* D.E. 81-1 at 5. Among the terms included in the Workscope Agreement were a clause indicating that Plaintiff was responsible for engine repair or overhaul work and a section detailing the cost schedule for work "over and above" that expressly contemplated by the Workscope Agreement. D.E. 79, ¶¶ 2-3; *see also* D.E. 81-1 at

---

[1] The parties have incorporated by reference their respective statements of fact made in support of and in opposition to Sanchez's summary-judgment motion. *See* D.E. 86, ¶ 1; D.E. 106, ¶ 1.

[2] Elsewhere, Defendants maintain that the Workscope Agreement was executed on July 7, 2010. *See, e.g.*, D.E. 86, ¶ 3. However, the agreement itself reflects a signature date of June 21, 2010. D.E. 81-1 at 5.

2-3, 4. The Aircraft arrived in Miami, Florida, in August 2010, and work on it began shortly thereafter by Commercial Jet, Inc. ("Commercial Jet"), a Federal Aviation Administration-licensed repair facility, and other entities contracted by ACG. D.E. 79, ¶¶ 3, 5, 10; D.E. 105, ¶¶ 5, 10, 30. Deschryver visited the Commercial Jet facility in September 2010. D.E. 106, ¶ 10.

After work began, it was discovered that the Aircraft's engines needed to be replaced. D.E. 79, ¶¶ 3, 9; D.E. 105, ¶ 3. Originally, all four of the Aircraft's engines were going to receive an "Airworthiness Directive" corrosion treatment that would have extended the life of the engine for fourteen years. D.E. 86, ¶ 13; D.E. 106, ¶ 12. It was discovered that two of the four engines lacked proper records, however, and ACG rejected them. D.E. 86, ¶ 14; D.E. 106, ¶ 12. According to Plaintiff, Abad then represented that ACG would procure two replacement engines with the appropriate fourteen-year corrosion treatment at $250,000 apiece, but instead ACG obtained two unacceptable engines for a greatly reduced priced and kept the difference for itself. D.E. 106, ¶ 12. Defendants dispute that Abad made any representations about purchasing replacement engines of a certain price or quality or that the parties reached any agreement regarding the purchase of replacement engines. D.E. 86, ¶¶ 13, 15. Nonetheless, ACG apparently did obtain two replacement engines. D.E. 86, ¶ 18; D.E. 106, ¶ 18. Defendants maintain that Plaintiff rejected one of the two engines; Plaintiff asserts that it rejected both. *Id.*

Further, Plaintiff desired the Aircraft's engines to be fitted with Stage III hush kits.[3] D.E. 107-3 at 33. On June 16, 2010, Abad sent an email to Zacharie Nankwaya, an aviation technical

---

[3] Hush kits are a type of equipment that can be installed on older jet aircraft engines to reduce their noise level. Stage III refers to the regulatory standard for aircraft noise. *See* Roger A. Mola, *How Things Work: Hush Kits*, Air & Space Magazine (Jan. 2005), http://www.airspacemag.com/how-things-work/kits.html.

adviser and associate of Deschryver's, indicating that ACG had sold the kit it previously had and would require a couple of days to locate a new one. *Id.* On June 24, 2010, Abad followed up, sending Nankwaya and Deschryver an email noting that ACG had a "lead" on a "burbank kit" for a price of $1,350,000.00. *Id.* at 37. Despite attempts to locate a Stage III hush kit for the Aircraft, Abad learned on November 4, 2010, that there were no available kits for a Boeing 707-100 series aircraft like the one at issue. D.E. 107-1 at 11-12; D.E. 107-3 at 39. Later that same day, however, Abad sent an email to Deschryver and Nankwaya stating that the Stage III kit would arrive on November 22, 2010, and they would begin installation of the kit, although Abad later testified that this was based on a "fictitious" lead. D.E. 107-3 at 42; D.E. 82-2 at 7-8. Abad again emailed Nankwaya on January 3, 2011, advising that "we are installing engines and working on stage III this week." D.E. 107-3 at 47. In fact, however, as Abad concedes, he never actually located a Stage III hush kit for the Aircraft but made this statement instead based solely on "leads." D.E. 82-2 at 8-9.

Further, despite not ever having located an appropriate Stage III hush kit, on October 26, 2010, Abad sent Deschryver an email indicating that without a wire transfer of $1,000,000, ACG would not be able to install, among other things, a Stage III kit. D.E. 107-3 at 15. Further, billing records indicate that ACG invoiced DRC $1,350,000 for the Stage III kits and that DRC paid at least some of that money, although ACG's Chief Financial Officer Antonio Neuman testified that the money for the Stage III hush kits was credited back to the DRC. D.E. 107-3 at 13; D.E. 82-4 at 4.

Plaintiff DRC has levied three fraud claims against ACG and Abad in its Complaint. *See* D.E. 1. Count I alleges fraud in the inducement to enter the Workscope Agreement based on the alleged misrepresentation that ACG had an MRO facility and could perform the work itself rather than merely assign the work—at a markup—to Commercial Jet and others. *Id.* at 12-13. Count III

claims fraud relating to the replacement engines based on the fact that ACG allegedly never intended to purchase engines of the quality and price agreed upon. *Id.* at 14. Count IV asserts fraud regarding the non-procurement of the Stage III hush kits. *Id.* at 15. Plaintiff has also made a claim against ACG and Abad under Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*, based on the alleged frauds set out above as well as certain billing irregularities. *See id.* at 16-17.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009). The Court does not weigh conflicting evidence. *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007). Nor does the Court determine the credibility of witnesses. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012)

(citation omitted). Upon discovering a genuine material dispute, the Court must deny summary judgment and proceed to trial. *Id.* at 1292.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343.

Local Rule 56.1, S.D. Fla., further factors into this Court's consideration of a motion for summary judgment. Under Local Rule 56.1, a party moving or opposing summary judgment must submit a "statement of the material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively." S.D. Fla. L.R. 56.1(a). The rules require these statements be supported by "specific references" to evidence on the record. S.D. Fla. L.R. 56.1(a)(2). The Local Rules expressly caution, "All material facts set forth in the movant's statement filed and supported as required above will be *deemed admitted* unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b) (emphasis added). But

even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that the evidence on the record supports the uncontroverted material facts that the movant has proposed. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

### III. DISCUSSION

#### A. Defendants' Future Action Argument

Under Florida law, to prevail on a claim for fraud, a plaintiff must show 1) a false statement concerning a specific material fact; 2) the speaker's knowledge that the representation is false; 3) an intention that the representation induces another's reliance; and 4) consequent injury to the other party acting in reliance on the representation. *Wadlington v. Cont'l Med. Servs., Inc.*, 907 So. 2d 631, 632 (Fla. 4th DCA 2005).[4]  Generally, to be actionable fraud, the false statement must be of a "past or existing fact, not a promise to do something in the future." *Id.* (quoting *Vance v. Indian Hammock Hunt & Riding Club, Ltd.*, 403 So. 2d 1367, 1371 (Fla. 4th DCA 1981)). An exception to this general rule exists when the promise to perform in the future is made without any intention of performing or made with the positive intention not to perform. *Id.*

---

[4] The elements of common-law fraud-in-the-inducement are materially identical: A plaintiff must demonstrate 1) that a misrepresentation of material fact occurred; 2) that the defendant knew or should have known of the statement's falsity; 3) that the defendant intended the plaintiff to rely on the misrepresentation; and 4) that the plaintiff suffered injury in reliance on the representation. *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010); *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 304 (Fla. 1st DCA 1999); *see also Output, Inc. v. Danka Bus. Sys., Inc.*, 991 So. 2d 941, 944 (Fla. 4th DCA 2008) (citation omitted).

Defendants argue that they are entitled to summary judgment because "the alleged misrepresentations in this case each involve promises regarding future action" and that the record contains no evidence showing that Abad "lacked the intention to perform the promise[s] or specifically intended not to perform" the promises. D.E. 86 at 13. The Court considers and rejects each of Defendants' arguments in turn.

With regard to Count I, Plaintiff alleges that the misrepresentation involved the existing facts that ACG owned an MRO facility and could perform the work itself. *See* D.E. 106 at 13. In response, Defendants assert that because the Workscope Agreement provided for a DRC representative to be onsite, it makes no sense that Defendants would have lied about who would perform the work. D.E. 86 at 13-14. Defendants, though, do not explain how the fact that the Workscope Agreement provides for a DRC representative to be onsite for the duration of the repairs turns the misrepresentations alleged in Count I into promises of future action, nor can the Court discern how this contract provision would do so. Because the alleged misrepresentations concern facts existing at the time, they are actionable as fraud without any inquiry into Defendants' state of mind regarding future performance. Thus, Plaintiff is not required to show that Defendants had no intention[5] of performing a future action at the time the statements about ACG's capabilities were

---

[5] Even if the misrepresentation pertained to a future promise, Defendants would not be entitled to summary judgment on the issue of Abad's intent when the misrepresentation was made. While not entirely clear, Defendants may be arguing that because the contract provided for a DRC representative to observe and, presumably, discover that ACG was not performing work, the Court must necessarily infer that Abad had no intent to not perform the future promise. But even assuming that DRC would have eventually learned that ACG would not perform the work does not necessarily mean that Abad therefore could not have intended not to perform the alleged promise at the time he made it. Abad, for instance, may have intended a "bait and switch," enticing the DRC to enter the agreement all the while confident that he could later persuade the DRC that it made no difference who performed the work. Moreover, the Court has previously noted that the Agreement is ambiguous as to who would perform the work, and,

made, and summary judgment would be inappropriate as to Count I on a future-promise rationale.[6]

With regard to Count III, Defendants claim that "it is apparent that no one can even identify when Abad allegedly made a representation regarding the replacement engines." D.E. 86 at 14. But Plaintiff points to Abad's own deposition where he testified that he told Deschryver "[t]hat we can get two engines for on and off around the $250,000 . . . and we can put them to the shop to make sure that they had have time remaining." D.E. 107-1 at 7. Similarly, Plaintiff directs the Court to Deschryver's sworn deposition testimony that Abad told him that Abad was having engines of the requisite quality and price brought in from Ireland and the fact that Abad instead procured engines without the necessary corrosion treatment for a significantly reduced price, as evidence that Abad never intended to perform his promise. *See* D.E. 107-2 at 22; *see also* D.E. 107-1 at 8, 15; D.E. 107-3 at 24. Given that Florida law allows intent to be proved by circumstantial evidence and that Florida courts generally disfavor summary disposition of the intent question, the Court finds the evidence that Plaintiff has brought forth sufficient to survive summary judgment. *See Wadlington*, 907 So. 2d at 633 (citing *D&M Jupiter, Inc. v. Friedopfer*, 853 So. 2d 485 (Fla. 4th DCA 2003)); *Cohen v. Kravit Estate Buyers, Inc.*, 843 So. 2d 989, 991 (Fla. 4th DCA 2003) ("In fraud cases,

---

consequently, an unresolved question remains as to what Plaintiff would have expected its representative to witness at the time that Plaintiff was induced to enter the Workscope Agreement. *See* D.E. 24 at 10. At the time Plaintiff executed the contract, it could just as easily have expected its representative to witness work being performed by ACG at ACG's MRO facility. Thus, the inference that Defendants seek to have this Court make from the onsite-representative provision about Abad's intent is not the only inference that can be drawn, and, at the summary-judgment stage, all inferences must be made in favor of the nonmovant.

[6] To the extent that Defendants claim that "it is not reasonable for a party to breach an agreement by not sending a representative and then use that breach as a basis to claim it did not have knowledge regarding where work would be performed," D.E. 86 at 14, any subsequent breach by Plaintiff is irrelevant to the questions of whether Defendants' statement was of present fact or future action and the question of Defendants' intent at the time the statement was made.

summary judgment is rarely proper as the issue so frequently turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge."). Accordingly, summary judgment on Count III is denied.

With respect to Count IV, Defendants contend that the June 2010 email regarding a "lead" on Stage III hush kits for $1,350,000.00, is not a "current fact that rises to the level of fraud." D.E. 86 at 14. Defendants also make the cursory statement that "Air Capital never charged the DRC for the hush kits and therefore [DRC] has not met all the elements of a fraud claim." *Id.* Even if this "lead" is by itself a future promise rather than current fact, Plaintiff has pointed to several emails sent by Abad to Plaintiff after Abad learned in November 2010 that no hush kits were available, which nonetheless indicated to Plaintiff that installation of non-existent hush kits was imminent. D.E. 107-3 at 39, 42, 47. As with Count III, these emails sufficiently raise questions of material fact as to Abad's intent. Furthermore, to the extent that Defendants contend that they did not charge Plaintiff for the hush kits, they overstate their case. It is undisputed that Defendants billed Plaintiff for the hush kits, but questions remain as to whether ACG correctly credited this money back to DRC. D.E. 107-3 at 13, 15; D.E. 82-4 at 4.. Accordingly, even if Defendants may have later credited this amount to other outstanding balances, the mere fact of crediting these amounts does not necessarily mean that Plaintiff suffered no damages from paying the money in the first place; it merely raises a question as to the extent of the damages suffered. In light of the foregoing, summary judgment is not appropriate on Count IV.

**B. Defendants' Count I Reliance Argument**

Defendants Abad and ACG reiterate the argument made by Defendant Sanchez that, even if, for the sake of argument, Abad made misrepresentations about ACG's ownership of an MRO

facility and its ability to perform the work, Plaintiff could not have relied as a matter of law on these statements because such representations were obviously false. D.E. 86 at 14-15. The Court rejects these arguments for the same reasons set forth in the order on Sanchez's summary-judgment motion.

To maintain a fraudulent-inducement claim, a plaintiff must have suffered injury in reliance on the misrepresentation. *W.R. Townsend Contracting*, 728 So. 2d at 304. In the context of fraud, demonstrating "justifiable reliance" is not necessary, and a party is not required to investigate the representation before relying upon it. *Butler*, 44 So. 3d at 105. However, in certain circumstances in the context of fraud, reliance may be improper as a matter of law. *See M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 95 (Fla. 2002). Put another way, a plaintiff "may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him." *Butler*, 44 So. 3d at 105 (internal quotation marks omitted). Determining whether the plaintiff knows that a representation is false or whether falsity is "obvious" to the plaintiff requires "consideration of the totality of the circumstances surrounding the type of information, the nature of the communication between the parties, and the relative positions of the parties." *Azam*, 813 So. 2d at 95.

Defendants point to several facts to demonstrate that "the location of where the repairs were to be performed was patently obvious to the DRC" and that, as a matter of law, DRC could not have relied on Abad's representation. D.E. 86 at 15. First, Defendants note that prior to the execution of the Workscope Agreement, a representative of DRC's Civil Aviation Authority ("CAA") conducted an audit of Commercial Jet's facility in Miami, and thus "it became obvious that the repairs would be performed at Commercial Jet." *Id.* This argument fails for two reasons. First, as the Court has previously explained, the misrepresentations at the heart of Plaintiff's fraud-in-the-

-11-

inducement claim are about *who* would perform the work, not *where* the work would be performed. D.E. 24 at 10. Even if it had been obvious that the work would be performed at the Commercial Jet facility, it does not automatically follow, without more, that Commercial Jet would be performing the work.

Nevertheless, assuming that Defendants are arguing that the CAA audit made it obvious that Commercial Jet would be performing the repairs, Plaintiff has pointed to evidence that raises questions of material fact as to whether the DRC representative in charge of the Aircraft repairs—Deschryver—was aware of the CAA audit and whether the CAA audit even had anything to do with the Aircraft at issue. *See* D.E. 105 at 7. Deschryver has sworn that the CAA audit was not discussed with Sanchez and that it was unrelated to the repair of the Aircraft. D.E. 107-9. Plaintiff has also provided the declaration of the CAA representative, who stated that the audit was conducted at the behest of Hewa Bora, a private airline in the DRC, and was related to the maintenance of a Boeing 767 owned by Hewa Bora. *See* D.E. 107-8. This evidence is more than sufficient to raise a question of material fact as to whether the CAA audit made the falsity of Abad's misrepresentation known or obvious to Plaintiff.

Second, Defendants assert that "anyone, within seconds, can visit the FAA website, type in 'Miami' and discover that [ACG] is not authorized by the FAA to provide maintenance checks on aircraft." D.E. 86 at 15. However, in the context of fraud, a plaintiff is not required to investigate the truth of the representation, and here, the DRC was not required to research ACG's credentials on the FAA website.

The authorities Defendants cite that seemingly support a requirement to conduct "cursory" examinations or investigations before relying on a representation are distinguishable. In *Addison v.*

*Carballosa*, 48 So. 3d 951 (Fla. 3d DCA 2010), the Court found that the plaintiff could not rely on the defendants' alleged representation that terms in a contract had not been changed from one draft to another when the differences between the two drafts "were readily apparent, and were, in fact, highlighted by the defendants." *Id.* at 956. *Addison* recalled the plaintiff's duty to read the contract before signing it—a duty that, if followed, would have revealed the obvious falsity of the misrepresentation. As the Court noted previously, the Workscope Agreement is unclear as to who would perform the work. Accordingly, there was nothing in the Agreement that would reveal the obvious falsity of Abad's misrepresentation or require Plaintiff to go a step further and investigate the FAA records.

Similarly, in *Wasser v. Sasoni*, 652 So. 2d 411 (Fla. 3d DCA 1995), the court found that the plaintiff, a "sophisticated buyer" of commercial property, had a duty to exercise ordinary diligence and inspect the property he was buying before signing the purchase contract. *Id.* at 412-413. However, to the extent that the *Wasser* Court found that "there is no exception [to the duty to exercise ordinary diligence] where the parties are equally sophisticated, and have an equal opportunity to discover a defect," this finding is contradicted by the Florida Supreme Court's subsequent holdings in *Azam* and *Butler*, which clearly relieve the plaintiff of any investigatory duty in the context of intentional fraud.

Finally, Defendants argue that because the Workscope Agreement itself required the DRC to have a representative onsite, it "simply makes no sense that [ACG] would misrepresent who was working on the DRC Aircraft." D.E. 86 at 15. Defendants' argument confuses the issue, though, as this has nothing to do with DRC's reliance. Plaintiff maintains that Defendants misrepresented that ACG had a facility and would perform the work and that it relied on this misrepresentation in

-13-

entering a contract that has, among other terms, a provision that DRC have a representative onsite. Regardless of whether or not it "makes sense" for Abad to have made such a misrepresentation when a DRC representative would have been onsite, he nonetheless made the representation. Thus, from the DRC's point of view, its representative would be onsite monitoring *ACG's performance* of the work. Nothing in the provision requiring a DRC representative's presence makes it obvious that Abad's representation was false.

Defendants have failed to demonstrate that no questions of material fact exist concerning the DRC's reliance on the alleged misrepresentation and that they are entitled to judgment as a matter of law. Accordingly, Defendants Abad and ACG are not entitled to summary judgment on Count I based on a reliance argument.

### C. Defendants' Waiver Argument with Respect to Counts I and III

Defendants also reiterate their argument that because Florida law requires a plaintiff to choose between rescission or damages as a remedy for fraudulent inducement, and Plaintiff here seeks damages, it has "affirmed" the contract and "waived" its fraud claims in Counts I and III. D.E. 86 at 16-18. Although not entirely clear, Defendants seem to claim that seeking damages under the fraudulent-inducement claim is effectively a way "to rewrite the Workscope Agreement to lower the amount of the flat-rate charge"—in essence, allowing Plaintiff an opportunity to "rescind" a portion of the contract. Defendants also argue that Plaintiff waived its ability to reject the replacement engines. D.E. 86 at 17. Although Defendants do not spell it out, the Court assumes that by doing so, Defendants are making a similar argument with respect to Count III—because DRC cannot reject the engines, it has ratified and cannot rescind the agreement and, thus, it has waived is fraud claim regarding the replacement engines.

Defendants are correct that Florida law provides for an election between the remedies of rescission or damages in a fraudulent-inducement action. *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 313 (Fla. 2000). When a party seeks damages for a fraudulent-inducement claim, it "affirms the contract, and thus ratifies the terms of the agreement." *Id.* (citing *Hauser v. Van Zile*, 269 So. 2d 396, 398-99 (Fla. 4th DCA 1972)). This ensures that a party accepting the benefits of the contract also remains subject to the burdens of the contract. *Id.*

Although ratifying a contract waives a party's right to rescind it, *see id.*, the Court can find nothing in Florida law that suggests that by seeking damages—a permitted remedy for fraudulent inducement—a party waives its fraud claim. *See, e.g.*, *Levey v. Getleman*, 408 So. 2d 663, 665-66 (Fla. 4th DCA 1981) ("Although Levey, by accepting payment, ratified the contract thus barring a claim for rescission, he has not waived his right to damages for the fraud."). In fact, Defendants' notion that by pleading damages for a fraud claim the plaintiff waives its fraud claim would effectively remove damages a remedy for fraud.

One authority cited by Defendants seemingly supports a broad rule that a party waives a fraud claim by continuing under a contract, *i.e.*, ratifying a contract, after discovering the fraudulent nature of the representation that induced it to enter the agreement. *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 48 (Fla. 3d DCA 2006) (citing *Mazzoni Farms*, 761 So. 2d at 313) ("Therefore, since [plaintiff] chose to continue its agreement with C & L after discovering that [defendant's] alleged representations about C & L's solid financial conditions were untrue, [defendant's] misrepresentations were not the cause of any damages, and [plaintiff] waived its claim of fraud."). Although the precise nature of the agreement and the continued performance is not specified in the Third District's opinion, it is clear that the court found that the plaintiff suffered no

-15-

damages as a result of the fraud. However, in this case, disputed questions still remain as to whether Plaintiff suffered damages in reliance on Defendants' misrepresentations. *See* D.E. 105 at 16-17. Thus, at most, the *Fixel* decision stands for the proposition that a party that has ratified the contract (and thus waived a rescission claim) and has not incurred and therefore cannot recover any damages thereby waives the entire fraud claim—a situation different from that before this Court.

Similarly, to the extent that Defendants argue that an award of damages in this case would amount to an impermissible rewriting of the contract terms, Defendants misunderstand the nature of the remedy. Damages for a fraudulent-inducement claim compensate a plaintiff for the injury suffered as a result of the underlying fraud. *See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) (quoting *Bankers Trust Co. v. Pac. Emp'rs Ins. Co.*, 282 F.2d 106, 110 (9th Cir. 1960)) ("One who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud."). Recovery of these tort damages does not reduce or revise Plaintiff's responsibilities and burdens under the terms of the contract, even if it means that Defendants, overall, have less money in their pockets.

This analysis applies with equal force to Defendants' arguments about the replacement engines. Defendants cite provisions of Florida's Uniform Commercial Code dealing with the acceptance or rejection of goods under a contract. *See* D.E. 86 at 17-18. As stated above, however, Plaintiff is not seeking rescission of the contract in Count III—it is seeking damages incurred as a result of an alleged fraud. While the issue of timely rejection may be relevant to Plaintiff's breach-of-contract claims, Defendants point to no authority that supports finding the acceptance of goods waives outright any fraud claims independent of the contract. Of course, Plaintiff must still prove

at trial all elements of the independent fraud in order to recover. *See Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 408-09 (Fla. 2013) (Pariente, J., concurring).

Because the Court finds that Plaintiff has not waived its fraud claims solely because it may have ratified a contract or accepted goods, summary judgment on Counts I and III would be inappropriate.

**D. FDUTPA Claim**

A claim under FDUTPA has three elements: 1) a deceptive act or unfair practice; 2) causation; and (3) actual damages. *Wright v. Emory*, 41 So. 3d 290, 292 (Fla. 4th DCA 2010). Deceptive acts include representations, omissions, or practices that are likely to mislead the consumer acting reasonably in the circumstances. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Unfair practices are those that offend established public policy and are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* Under FDUTPA, "the proscription against unfair and deceptive acts and practices sweeps far more broadly than the doctrine of fraud." *Hetrick v. Ideal Image Dev. Corp.*, 372 F. App'x 985, 992 (11th Cir. 2010).

Here, Defendants argue that they cannot be held liable under FDUTPA for the misrepresentations addressed in Count I because no "reasonable purchaser of maintenance services in [Plaintiff's] circumstances would likely have been misled." D.E. 86 at 19. Defendants suggest that a reasonable purchaser of aircraft maintenance services would have investigated the facilities credentials and "would not have ignored 6 references to Commercial Jet in the parties' Workscope Agreement." *Id.* However, Defendants point to no authority or evidence indicating that, as a matter of law, a reasonable aircraft-maintenance-service purchaser would do these things. Furthermore,

given that FDUTPA sweeps more broadly than common-law fraud and that, in Florida, a plaintiff need not investigate the truth of an intentional fraud, the Court does not agree that acting reasonably in the circumstances of intentional fraud required an investigation of ACG's credentials. Finally, the Court has already found the contract ambiguous as to who would perform the work, despite the references to Commercial Jet in the Agreement. Thus, at this juncture, Defendants have failed to demonstrate that, as a matter of law, Plaintiff acted unreasonably under the circumstances.

With regard to Counts III and IV, Defendants argue that "the conduct alleged with respect to the replacement engines and hush kits amounts at best to a breach of contract and does not rise to the level of a FDUTPA violation." *Id.* at 20. However, as indicated above, material disputes still remain concerning whether Defendants engaged in fraudulent conduct—*i.e.*, tortious conduct independent of any contract breach—concerning the engines and hush kits. If a jury find that Defendants engaged in fraud, that fraud could support liability under FDUTPA. Accordingly, summary judgment must be denied with respect to the Count V.

## IV. CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Defendants Air Capital Group's and Mario Abad's Motion for Summary Judgment [D.E. 86] is **DENIED**.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 24th day of June 2013.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies to:

The Honorable Barry S. Seltzer
Counsel of record