UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20607-CIV-ROSENBAUM/SELTZER

DEMOCRATIC REPUBLIC OF THE CONGO,

    Plaintiff,

vs.

AIR CAPITAL GROUP, LLC, *et al.*,

    Defendants.
_____/

## ORDER DENYING DEFENDANT SANCHEZ'S MOTION FOR SUMMARY JUDGMENT

    This matter is before the Court upon Defendant Jaime Sanchez's Motion for Summary Judgment [D.E. 79]. The Court has reviewed the parties' briefs and statements of material facts and the evidence on the record and is otherwise fully informed in this matter. For the reasons set forth below, the Court denies Defendant Sanchez's Motion for Summary Judgment.

### I. MATERIAL FACTS

    Defendant Jaime Sanchez is the President of Defendant Air Capital Group, LLC ("ACG"), a Florida limited-liability company. D.E. 81-3, ¶ 1. In June 2010, Sanchez, along with Co-Defendant Mario Abad (the Chief Executive Officer of ACG), attended a meeting with Charles Deschryver in Kinshasa, Democratic Republic of the Congo ("DRC"). D.E. 79, ¶ 22; D.E. 105, ¶ 22. Deschryver is a representative of the DRC. D.E. 105, ¶6.

    During the June 2010 meeting, Deschryver asked Abad if he would be able to repair and refurbish the Boeing 707 aircraft ("Aircraft") at the center of this lawsuit. D.E. 79, ¶ 22; D.E. 105,

¶ 22. According to Plaintiff, Abad represented that ACG owned a maintenance, repair, and overhaul ("MRO") facility and could perform the requested work on the Aircraft. D.E. 105, ¶ 22. Defendants have conceded, at least for the purposes of this Motion, that "Abad confirmed at the Kinshasa meeting that Air Capital had its own facility and personnel to work on the DRC Aircraft." D.E. 114 at 5. It is undisputed that during this meeting Sanchez said nothing regarding ACG's ownership of an MRO or its ability to perform the work. D.E. 79, ¶ 22; D.E. 105, ¶ 22.

Following this meeting,[1] on June 21, 2010,[2] Abad and Deschryver executed a "Workscope Agreement" for the repair and refurbishment of the Aircraft. *See* D.E. 81-1 at 5. Among the terms included in the Workscope Agreement were a clause indicating that Plaintiff was responsible for engine repair or overhaul work and a section detailing the cost schedule for work "over and above" that expressly contemplated by the Workscope Agreement. D.E. 79, ¶¶ 2-3; *see also* D.E. 81-1 at 2-3, 4. The Aircraft arrived in Miami, Florida, in August 2010, and work on it began shortly thereafter by Commercial Jet, Inc. ("CJI"), a Federal Aviation Administration-licensed repair facility, and other entities contracted by ACG. D.E. 79, ¶¶ 3, 5, 10; D.E. 105, ¶¶ 5, 10, 30.

After work began, it was discovered that the Aircraft's engines needed to be replaced, and the DRC and Abad reached an agreement for ACG to acquire replacement engines. D.E. 79, ¶¶ 3,

---

[1] The parties dispute whether a second meeting, which took place in Goma, DRC, and involved an inspection of the aircraft and similar representations by Abad in the presence of a silent Sanchez, occurred before or after the Workscope Agreement was signed. *See* D.E. 105 at 9, 14; D.E. 114 at 3-4. Nevertheless, it is undisputed the Kinshasa meeting did occur before the contract was signed and was materially indistinguishable from the Goma meeting in terms of representations made or not made.

[2] Elsewhere, Defendants maintain that the Workscope Agreement was executed on July 7, 2010. *See, e.g.*, D.E. 86, ¶ 3. However, the agreement itself reflects a signature date of June 21, 2010. D.E. 81-1 at 5.

9; D.E. 105, ¶ 3.  DRC maintains that Abad and ACG committed fraud regarding these engines.  *See* D.E. 1 (Count III).  As work progressed, Plaintiff was sent invoices, although it is not clear from the record what was invoiced when.  *See* D.E. 105, ¶ 9.  DRC claims it was excessively overbilled and also alleges that Defendants provided "fabricated or at least altered" invoices from third-party entities that had allegedly conducted work on the Aircraft.  *See* D.E. 1 (Count V).

Plaintiff DRC has levied two claims against Sanchez in its Complaint: fraud in the inducement to enter the Workscope Agreement (Count I) and a claim under Florida's Deceptive and Unfair Trade Practice Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* (Count V).  *See* D.E. 1.  The fraudulent-inducement claim is based on the alleged misrepresentation that ACG could and would perform the work itself rather than merely assign the work—at a markup—to Commercial Jet and others.  *Id.* at 12-13.  Plaintiff focuses its FDUTPA claim against Sanchez on Sanchez's role in the alleged fraudulent inducement as well as the alleged fraud regarding the replacement engines and billing improprieties.  *See id.* at 16-17; D.E. 105, ¶ 9.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

On a motion for summary judgment, the Court views the evidence, including all reasonable inferences drawn from it, in the light most favorable to the non-moving party and resolves all reasonable doubts against the movant. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008); *Johnson v. City of Mobile*, 321 F. App'x 826, 830 (11th Cir. 2009). The Court does not weigh conflicting evidence. *Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007), *reh'g and reh'g en banc denied*, 254 F. App'x 803 (11th Cir. 2007). Nor does the Court determine the credibility of witnesses. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citation omitted). Upon discovering a genuine material dispute, the Court must deny summary judgment and proceed to trial. *Id.* at 1292.

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once the moving party satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by his own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts suggesting that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343.

Local Rule 56.1, S.D. Fla., further factors into this Court's consideration of a motion for summary judgment. Under Local Rule 56.1, a party moving or opposing summary judgment must

submit a "statement of the material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively." S.D. Fla. L.R. 56.1(a). The rules require these statements be supported by "specific references" to evidence on the record. S.D. Fla. L.R. 56.1(a)(2). The Local Rules expressly caution, "All material facts set forth in the movant's statement filed and supported as required above will be *deemed admitted* unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b) (emphasis added). But even where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that the evidence on the record supports the uncontroverted material facts that the movant has proposed. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

### III. DISCUSSION

#### A. Fraud in the Inducement

Under Florida law, to prevail on a common-law fraud-in-the-inducement claim, a plaintiff must demonstrate 1) that a misrepresentation of material fact occurred; 2) that the defendant knew or should have known of the statement's falsity; 3) that the defendant intended the plaintiff to rely on the misrepresentation; and 4) that the plaintiff suffered injury in reliance[3] on the representation.

---

[3] In its 2010 *Butler* decision, the Florida Supreme Court clarified that "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation." *Butler*, 44 So. 3d at 105. The Florida Supreme Court based its conclusion, in part, on the policy of prohibiting "one who purposely uses false information to induce another into a transaction from profiting from such wrongdoing." *Id.* (quoting *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 336-37 (Fla. 1997)). While the Court recognizes that courts continue to characterize the fourth element of fraudulent inducement as "justifiable reliance," *see, e.g.*, *Prieto v. Smook, Inc.*, 97 So. 3d 916,

*Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010); *W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.*, 728 So. 2d 297, 304 (Fla. 1st DCA 1999); *see also Output, Inc. v. Danka Bus. Sys., Inc.*, 991 So. 2d 941, 944 (Fla. 4th DCA 2008) (citation omitted). Defendants argue that Sanchez is entitled to summary judgment on the inducement claim because Plaintiff cannot establish that (1) Sanchez made a misrepresentation of material fact, (2) Plaintiff's reliance on any misrepresentation was unjustified, and (3) Plaintiff has waived its fraud claim by seeking only damages and not rescission of the contract. The Court addresses each argument in turn.

1. Misrepresentation

To recover on a fraudulent-inducement claim, a plaintiff must show that the defendant made a misrepresentation of material fact. *Output, Inc.*, 991 So. 2d at 944. An omission of material fact can also support a claim of fraud in the inducement, but only if the defendant has a duty to disclose the information because of some fiduciary or other relationship of trust or confidence between the parties. *Cola v. Allstate Ins. Co.*, 131 F. App'x 134, 136 (11th Cir. 2005) (citing *Gutter v. Wunker*, 631 So. 2d 1117, 1118-19 (Fla. 4th DCA 1994)); *see State v. Mark Marks, P.A.*, 698 So. 2d 533, 539 (Fla. 1997). Thus, in an arm's-length transaction, "neither party owes a duty to the other to act for that party's benefit or protection, or to disclose facts that the other party could have discovered through its own diligence." *Behrman v. Allstate Ins. Co.*, 388 F. Supp. 2d 1346, 1351 (S.D. Fla. 2005). However, if a defendant undertakes to disclose some information in the context of an arm's-length transaction, it must disclose all material facts. *Gutter*, 631 So. 2d at 1118-19.

---

917 (Fla. 4th DCA 2012), these courts often cite pre-*Butler* authorities, and, in any event, the Florida Supreme Court has spoken definitively on the issue.

Florida law recognizes that corporate officers may also be held liable for the fraudulent misrepresentations of other officers, if even the defendant made no affirmative representation himself, if the defendant conspired with other officers to fraudulently induce a plaintiff to act. *See Nicholson v. Kellin*, 481 So. 2d 931, 935-36 (Fla. 5th DCA 1985). This liability exists even when conspiracy is not pled, as long as all of the elements of conspiracy are met. *Segal v. Rhumbline Int'l, Inc.*, 688 So. 2d 397, 399-400 (Fla. 4th DCA 1997).

Civil conspiracy in Florida includes four elements: 1) an agreement between two or more parties, 2) to do an unlawful act or to do a lawful act by unlawful means; 3) where some overt act in performed in pursuance of the conspiracy, and 4) damage to the plaintiff results from the acts done under the conspiracy. *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008) (citations omitted). An agreement may be express or implied, and each conspirator need not act to further a conspiracy. *Id.*; *Witmer v. Dep't of Bus. & Prof'l Regulation, Div. of Pari-Mutuel Wagering*, 631 So. 2d 338, 342 (Fla. 4th DCA 1994). Each conspirator "need only know of the scheme and assist in some way to be held responsible," and a conspirator's involvement may be inferred from circumstantial evidence. *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987).

The parties here do not dispute that Sanchez made no affirmative misrepresentation to Plaintiff prior to Plaintiff's entering the Workscope Agreement. *See* D.E. 105 at 12; D.E. 114 at 2. Accordingly, the first element of fraud in the inducement—a misrepresentation by Sanchez—must be based on either[4] a duty to disclose information that Sanchez failed to disclose or on Sanchez's

---

[4] Plaintiff also characterizes its conspiracy argument as creating a "duty to disclose," but this argument is more properly characterized as a theory of joint liability for the affirmative misrepresentation.

liability for Abad's affirmative misrepresentation.[5] Here, the Court finds that while Sanchez had no individual duty to disclose any facts, outstanding questions of material fact exist as to whether Sanchez was involved in conspiracy with Abad to fraudulently induce Plaintiff into entering the contract.

As noted, a duty to disclose arises in two contexts: from a relationship of trust between the parties or from a defendant's voluntary disclosure of some facts. Plaintiff makes no argument that Sanchez was in a position of trust with the DRC. But Plaintiff does argue that at the Goma meeting, Sanchez was present for an inspection of the Aircraft and a meeting regarding the results held afterward. D.E. 105 at 14. Plaintiff does not point to any evidence that Sanchez said anything at these events but suggests that his mere presence represents "an 'undertaking' to disclose facts." *Id.*

This argument is unavailing for two reasons. First, as pointed out above, there is a dispute as to whether the Goma meeting took place before or after the contract was executed; *i.e.*, a dispute as to whether anything at the Goma meeting could have induced DRC to enter the contract. *See* D.E. 105 at 9, 14; D.E. 114 at 3-4. Secondly, Plaintiff cites no authority supporting its proposition that mere presence at an inspection or meeting amounts to an "undertaking to disclose facts," and the Court is unwilling to reach so far, particularly when Florida law seemingly dictates that partial disclosure requires a statement or act on the part of Defendant. *See Joiner v. McCullers*, 28 So. 2d 823, 825 (Fla. 1947) ("The concealment becomes a fraud . . . where in addition to a party's silence there is *any statement, word or act on his part* which tends affirmatively to a suppression of the

---

[5] As noted, Defendants have conceded that Abad misrepresented ACG's capabilities. *See* D.E. 114 at 5.

truth, or to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts . . . ." (emphasis added)).

Nonetheless, there are material questions of fact as to whether Sanchez and Abad conspired to misrepresent whether ACG possessed a repair facility and would do the work on the Aircraft itself. Plaintiff points to the following facts that it argues raise a question of material fact about a conspiracy: Sanchez was present at the Kinshasa meeting and was "next to" Abad when he made the misrepresentation, D.E. 105, ¶ 22; Sanchez is President of ACG, *id.* at 13; and despite the foregoing, Sanchez said nothing to correct Abad's statements, *id.* ¶ 8. Viewed in the light most favorable to Plaintiff, with all inferences from them drawn in favor of Plaintiff, these facts represent sufficient, circumstantial evidence that Sanchez and Abad may have conspired to misrepresent ACG's capabilities in order to induce DRC to enter the contract for work on the Aircraft. Accordingly, summary judgment would inappropriate at this juncture.

Defendants' attempts to show that no questions of material fact exist with regard to a conspiracy are unpersuasive. First, Defendants contend that the conspiracy theory of liability is inapplicable because "Sanchez has not been sued for conspiring with Abad to commit fraud; he was sued for directly committing fraud." D.E. 114 at 7. However, as noted above, conspiracy need not be pled to hold a corporate officer liable for fraud as long as the elements of conspiracy are proved. *See Segal*, 688 So. 2d at 400. As long as Plaintiff proves the elements of conspiracy and the underlying tort at trial, Sanchez may be held "directly" liable for the fraud as a co-conspirator. *See Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 460 (Fla. 5th DCA 1999) ("Conspiracy is not a separate or independent tort but is a vehicle for imputing the tortuous [*sic*] actions of one co-conspirator to another to establish joint and several liability." (citation omitted)).

Next, Defendants contend that although testimony exists that Sanchez was "next to" Abad at the Kinshasa meeting, there is no evidence on the record that Sanchez actually heard Abad make the misrepresentation. D.E. 114 at 4. While Defendants correctly note that Plaintiff has pointed to no testimony that Sanchez actually heard Abad during the meeting, it is reasonable to infer that an individual heard what the person next to him said during a meeting, particularly one with relatively few participants. Defendants' argument merely affirms that a question of fact remains regarding whether what Sanchez heard, if anything, supports finding a conspiracy. Because questions of material fact exist regarding a conspiracy between Sanchez and Abad to misrepresent ACG's capabilities, Sanchez is not entitled to summary judgment on the fraudulent-inducement claim based on the absence of a misrepresentation of fact.

2. Reliance

As described above, to maintain a fraudulent-inducement claim, a plaintiff must have suffered injury in reliance on the misrepresentation. *W.R. Townsend Contracting*, 728 So. 2d at 304. In the context of fraud, demonstrating "justifiable reliance" is not necessary, and a party is not required to investigate the representation before relying upon it. *Butler*, 44 So. 3d at 105. However, in certain circumstances in the context of fraud, reliance may be improper as a matter of law. *See M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 95 (Fla. 2002). Put another way, a plaintiff "may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him." *Butler*, 44 So. 3d at 105 (internal quotation marks omitted). Determining whether the plaintiff knows that a representation is false or whether falsity is "obvious" to the plaintiff requires "consideration of the totality of the circumstances surrounding the type of information, the nature

of the communication between the parties, and the relative positions of the parties." *Azam*, 813 So. 2d at 95.

Defendants point to several facts to demonstrate that "the location of where the repairs were to be performed was patently obvious to the DRC" and that, as a matter of law, DRC could not have relied on Abad's representation. D.E. 79 at 16. First, Defendants note that prior to the execution of the Workscope Agreement, a representative of DRC's Civil Aviation Authority ("CAA") conducted an audit of Commercial Jet's facility in Miami, and thus "it became obvious that the repairs would be performed at Commercial Jet." *Id.* This argument fails for two reasons. First, as the Court has previously explained, the misrepresentations at the heart of Plaintiff's fraud-in-the-inducement claim are about *who* would perform the work, not *where* the work would be performed. D.E. 24 at 10. Even if it had been obvious that the work would be performed at the Commercial Jet facility, it does not automatically follow, without more, that Commercial Jet would be performing the work.

Nevertheless, assuming that Defendants are arguing that the CAA audit made it obvious that Commercial Jet would be performing the repairs, Plaintiff has pointed to evidence that raises questions of material fact as to whether the DRC representative in charge of the Aircraft repairs—Deschryver—was aware of the CAA audit and whether the CAA audit even had anything to do with the Aircraft at issue. *See* D.E. 105 at 7. Deschryver has sworn that the CAA audit was not discussed with Sanchez and that it was unrelated to the repair of the Aircraft. D.E. 107-9. Plaintiff has also provided the declaration of the CAA representative, who stated that the audit was conducted at the behest of Hewa Bora, a private airline in the DRC, and was related to the maintenance of a Boeing 767 owned by Hewa Bora. *See* D.E. 107-8. This evidence is more than

sufficient to raise a question of material fact as to whether the CAA audit made the falsity of Abad's misrepresentation known or obvious to Plaintiff.

Second, Defendants assert that "anyone, within seconds, can visit the FAA website, type in 'Miami' and discover that [ACG] is not authorized by the FAA to provide maintenance checks on aircraft." D.E. 79 at 16-17. Although it maintains that it is impossible to state this as an undisputed fact, *see* D.E. 105, ¶ 13, Plaintiff does not point to any evidence to dispute this fact and consequently it must be deemed admitted. However, as detailed above, in the context of fraud, a plaintiff is not required to investigate the truth of the representation, and here, the DRC was not required to research ACG's credentials on the FAA website.

The authorities Defendants cite that seemingly support a requirement to conduct "cursory" examinations or investigations before relying on a representation are distinguishable. In *Addison v. Carballosa*, 48 So. 3d 951 (Fla. 3d DCA 2010), the Court found that the plaintiff could not rely on the defendants' alleged representation that terms in a contract had not been changed from one draft to another when the differences between the two drafts "were readily apparent, and were, in fact, highlighted by the defendants." *Id.* at 956. *Addison* recalled the plaintiff's duty to read the contract before signing it—a duty that, if followed, would have revealed the obvious falsity of the misrepresentation. As the Court noted previously, the Workscope Agreement is unclear as to who would perform the work. Accordingly, there was nothing in the Agreement that would reveal the obvious falsity of Abad's misrepresentation or require Plaintiff to go a step further and investigate the FAA records.

Similarly, in *Wasser v. Sasoni*, 652 So. 2d 411 (Fla. 3d DCA 1995), the court found that the plaintiff, a "sophisticated buyer" of commercial property, had a duty to exercise ordinary diligence

and inspect the property he was buying before signing the purchase contract. *Id.* at 412-413. However, to the extent that the *Wasser* Court found that "there is no exception [to the duty to exercise ordinary diligence] where the parties are equally sophisticated, and have an equal opportunity to discover a defect," this finding is contradicted by the Florida Supreme Court's subsequent holdings in *Azam* and *Butler*, which clearly relieve the plaintiff of any investigatory duty in the context of intentional fraud.

Finally, Defendants argue that because the Workscope Agreement itself required the DRC to have a representative onsite, it "simply makes no sense that [ACG] would misrepresent who was working on the DRC Aircraft." D.E. 79 at 17. Defendants' argument confuses the issue, though, as this has nothing to do with DRC's reliance. Plaintiff maintains that Defendants misrepresented that ACG would perform the work and that it relied on this misrepresentation in entering a contract that has, among other terms, a provision that DRC have a representative onsite. Defendants concede that Abad made the misrepresentation about ACG's capabilities. Thus, whether or not it "makes sense" for Abad to have made such a misrepresentation when a DRC representative would have been onsite, he nonetheless made the representation. Thus, from the DRC's point of view, its representative would be onsite monitoring *ACG's performance* of the work. Nothing in the provision requiring a DRC representative's presence makes it obvious that Abad's representation was false.

Defendants have failed to demonstrate that no questions of material fact exist concerning the DRC's reliance on the alleged misrepresentation and that they are entitled to judgment as a matter of law. Accordingly, Defendant Sanchez is not entitled to summary judgment on the fraudulent-inducement claim based on the reliance issue.

3. Waiver

Defendants also make an argument that because Florida law requires a plaintiff to choose between rescission or damages as a remedy for fraudulent inducement, and Plaintiff here seeks damages, it has "affirmed" the contract and "waived" its fraudulent-inducement claim. D.E. 79 at 18-19.  Although not entirely clear, Defendants seem to claim that seeking damages under the fraudulent-inducement claim is effectively a way "to rewrite the Workscope Agreement to lower the amount of the flat-rate charge"—in essence, allowing Plaintiff an opportunity to "rescind" a portion of the contract.  The Court disagrees.

Defendants are correct that Florida law provides for an election between the remedies of rescission or damages in a fraudulent-inducement action. *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 313 (Fla. 2000).  When a party seeks damages for a fraudulent-inducement claim, it "affirms the contract, and thus ratifies the terms of the agreement." *Id.* (citing *Hauser v. Van Zile*, 269 So. 2d 396, 398-99 (Fla. 4th DCA 1972)).  This ensures that a party accepting the benefits of the contract also remains subject to the burdens of the contract. *Id.*

Although ratifying a contract waives a party's right to rescind it, *see id.*, the Court can find nothing in Florida law that suggests that by seeking damages—a permitted remedy for fraudulent inducement—a party waives its fraud claim. *See, e.g.*, *Levey v. Getleman*, 408 So. 2d 663, 665-66 (Fla. 4th DCA 1981) ("Although Levey, by accepting payment, ratified the contract thus barring a claim for rescission, he has not waived his right to damages for the fraud.").  In fact, Defendants' notion that by pleading damages for a fraud claim the plaintiff waives its fraud claim would effectively remove damages a remedy for fraud.

One authority cited by Defendants seemingly supports a broad rule that a party waives a fraud claim by continuing under a contract, *i.e.*, ratifying a contract, after discovering the fraudulent nature of the representation that induced it to enter the agreement. *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 48 (Fla. 3d DCA 2006) (citing *Mazzoni Farms*, 761 So. 2d at 313) ("Therefore, since [plaintiff] chose to continue its agreement with C & L after discovering that [defendant's] alleged representations about C & L's solid financial conditions were untrue, [defendant's] misrepresentations were not the cause of any damages, and [plaintiff] waived its claim of fraud."). Although the precise nature of the agreement and the continued performance is not specified in the Third District's opinion, it is clear that the court found that the plaintiff suffered no damages as a result of the fraud. However, in this case, disputed questions still remain as to whether Plaintiff suffered damages in reliance on Defendants' misrepresentations. *See* D.E. 105 at 16-17. Thus, at most, the *Fixel* decision stands for the proposition that a party that has ratified the contract (and thus waived a rescission claim) and has not incurred and therefore cannot recover any damages thereby waives the entire fraud claim—a situation different from that before this Court.

Similarly, to the extent that Defendants argue that an award of damages in this case would amount to an impermissible rewriting of the contract terms, Defendants misunderstand the nature of the remedy. Damages for a fraudulent-inducement claim compensate a plaintiff for the injury suffered as a result of the underlying fraud. *See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) (quoting *Bankers Trust Co. v. Pac. Emp'rs Ins. Co.*, 282 F.2d 106, 110 (9th Cir. 1960)) ("One who has been fraudulently induced into a contract may elect to stand by that contract and sue for damages for the fraud."). Recovery of these tort damages does not

reduce or revise Plaintiff's responsibilities and burdens under the terms of the contract, even if it means that Defendants, overall, have less money in their pockets.

Because the Court finds that Plaintiff has not waived its fraudulent-inducement claim, summary judgment on Count I would be inappropriate. Similarly, disputed questions of material fact remain concerning Sanchez's liability for Abad's misrepresentations and Plaintiff's reliance on these misrepresentations. Therefore, Defendant Sanchez's motion for summary judgment on the fraudulent-inducement claim must likewise be denied.

**B. FDUTPA Claim**

A claim under FDUTPA has three elements: 1) a deceptive act or unfair practice; 2) causation; and (3) actual damages. *Wright v. Emory*, 41 So. 3d 290, 292 (Fla. 4th DCA 2010). Deceptive acts include representations, omissions, or practices that are likely to mislead the consumer acting reasonably in the circumstances. *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). Unfair practices are those that offend established public policy and are "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* Under FDUTPA, "the proscription against unfair and deceptive acts and practices sweeps far more broadly than the doctrine of fraud." *Hetrick v. Ideal Image Dev. Corp.*, 372 F. App'x 985, 992 (11th Cir. 2010).

Here, Defendants argue that Sanchez cannot be held liable under FDUTPA because there is no evidence on the record that Sanchez engaged in any deceptive act or unfair practice. D.E. 79 at 19-20. However, fraud in the inducement certainly qualifies as a deceptive act or unfair practice under FDUTPA. Because the Court has already found there are disputed questions of material fact concerning Sanchez's liability for fraudulent inducement, there are necessarily disputed questions

of material fact concerning whether Sanchez engaged in deceptive or unfair conduct under FDUTPA.[6] Accordingly, summary judgment for Sanchez on Count V must be denied.

### IV. CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that Defendant Jaime Sanchez's Motion for Summary Judgment [D.E. 79] is **DENIED**.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 24th day of June 2013.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies to:

The Honorable Barry S. Seltzer
Counsel of record

---

[6] Because the disputed fraudulent-inducement claim is enough to maintain the FDUTPA action against Sanchez, the Court need not reach the question of Sanchez's involvement in purchasing replacement engines or billing improprieties as this juncture.