FILED BY _____ HH
_____ Deputy Clerk

Jan 7, 2016

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. MIAMI

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Douglas J. Mincher
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 07, 2016

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  14-11243-AA
Case Style: Democratic Republic of the Co v. Air Capital Group, LLC, et al
District Court Docket No: 1:12-cv-20607-RSR

Enclosed is the Bill of Costs.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Sincerely,

AMY C. NERENBERG, Acting Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

**UNITED STATES COURT OF APPEALS**
**For the Eleventh Circuit**
_____

No. 14-11243
_____

District Court Docket No.
1:12-cv-20607-RSR

DEMOCRATIC REPUBLIC OF THE CONGO,

Plaintiff -
Counter Defendant -
Appellee,

versus

AIR CAPITAL GROUP, LLC,

Defendant,
Cross Defendant -
Counter Claimant -
Third Party Plaintiff -
Appellant,

MARIO ABAD,
individually,

Defendant -
Third Party Plaintiff -
Counter Claimant -
Appellant,

JAMIE SANCHEZ,
individually,

Defendant -
Third Party Plaintiff -
Counter Claimant -
Appellant,

COMMERCIAL JET INC.

Defendant -
Counter Claimant -
Cross Claimant,

HEWA BORA AIRWAYS,

Third Party Defendant,

PHILLIPPE MOERLOOSE, et al.,

Defendants -
Third Party Defendants.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: June 11, 2015
For the Court: Douglas J. Mincher, Clerk of Court
By: Jeff R. Patch

ISSUED AS MANDATE 01/07/2016

[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11243
_____

D.C. Docket No. 1:12-cv-20607-RSR

THE DEMOCRATIC REPUBLIC OF THE CONGO,

Plaintiff-Appellee,

versus

AIR CAPITAL GROUP, LLC and MARIO ABAD,

Defendant-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 11, 2015)

Before MARTIN and FAY, Circuit Judges, and GOLDBERG,* Judge.

_____

*Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

GOLDBERG, Judge:

A vintage aircraft, a Miami executive, and a central African head of state. With a cast like that, one might confuse this case for a Bond film. But the matter before us is no work of fiction—it is the true story of an airplane maintenance check gone south and the weeks-long trial that followed. And the star of the show is not a tuxedoed spy, but the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), a law that protects consumers from predatory business schemes. *See* Fla. Stat. §§ 501.201–501.23.

The Democratic Republic of the Congo ("DRC") sued Air Capital Group, LLC ("ACG"), and its CEO, Mario Abad, for breach of contract, fraud, and FDUTPA violations. The DRC won a jury verdict, and the defendants now appeal aspects of the judgment, including jurisdiction, their liability under the FDUTPA, and monetary damages. We reject each of these challenges, however, because the trial court had proper jurisdiction and correctly interpreted Florida law. We thus affirm and close the book on a saga that began in a Kinshasa apartment.

# BACKGROUND

## A. The Workscope Agreement

Charles Deschryver had a problem.[1]  As the Logistical Assistant to Joseph Kabila, president of the DRC, Deschryver was charged to care for the president's aircraft, including a four-engine Boeing 707-100 (the "plane" or "707").  By early 2010, the plane was due for a "C-check," or heavy maintenance.  Deschryver searched from Ethiopia to Saudi Arabia to find a shop that would do the job, but without success.

Then in June 2010, Deschryver found what he thought he was looking for.  At a flat in Kinshasa (the DRC's capital), Deschryver met with Stavros Papaioannou, the CEO of Hewa Bora Airlines, and with two executives from ACG, Mario Abad and Jaime Sanchez.  Papaioannou suggested that ACG could do the C-check for Kabila's 707, and Abad agreed.  Deschryver was delighted by the news, and soon after the meeting ended, Abad and Sanchez inspected the plane at the airport.  Abad remarked the plane was in "good shape," and the parties agreed that ACG would fix the 707 in Florida.

Soon thereafter, Abad sent Deschryver a workscope agreement (the "Workscope" or "Agreement").  The Workscope said that ACG would perform the C-check, apply airworthiness directives ("ADs") to the plane's engines, and finish

---

[1] The facts that follow represent plaintiff's version of the evidence.  *See Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).

other tasks for a flat fee of $2,255,872.30.  Deschryver signed the Agreement for

the "Republic Democratic of Congo," and he stamped the seal of the Presidency of

the Republic on the signature block.

ACG prepared its first invoice for the DRC on July 30, 2010.  The DRC

requested the invoices because "they needed some sort of documentation to be able

to go to their government and get payments" from the Ministry of Finance.  The

DRC paid the first $1 million installment on July 12, and the plane arrived in

Florida on July 31.

**B. Oral Agreements to Replace Engines Three and Four**

Unwelcome difficulties arose soon after the plane reached Miami.  While

doing the C-check, ACG's "technical people discovered that one of the engines did

not have appropriate paperwork and needed to be replaced."  Abad and Sanchez

returned to the DRC to discuss the matter with Deschryver, and on September 10

or 11, the parties orally agreed to replace engine number three.  Deschryver asked

that the new engine come "with all the documents, QEC [quick engine change

equipment], all the AD and all the airworthiness directives and all the service in

order, a 707 engine."  The price for the engine would be $250,000.

Then, when Deschryver visited Miami in late September, he learned that

engine four also needed replacing.  In its stead, Deschryver wanted "a 707 engine

4

with all the service built in, all the AD, full QEC, full overhaul with all the

documents." Like engine three, engine four would cost $250,000.

## C. A String of Broken Promises

By October 28, 2010, the DRC had paid $4 million toward the cost of

repairs. Just days before, ACG's chief financial officer Antonio Neuman had

asked for more money even though the company held over $2 million in reserve,

allegedly to cover future charges. Deschryver was bewilderded by the mounting

costs but paid the money anyway, and Abad reassured Deschryver that the

replacement engines would soon arrive from Ireland. Abad added that he would

do a test flight on December 12 and deliver the plane by December 16.

Yet nothing happened the way Abad said it would. When the engines

arrived from Ireland, ACG learned that neither were properly documented. As a

result, the engines were unusable, and ACG agreed with ABX Air, Inc. ("ABX"),

to buy replacements. Antonio Neuman signed the contract with ABX, which set

the price of each new engine at $49,500. The replacement engines, which carried

serial numbers 645402 ("402") and 669706 ("706"), were not serviceable upon

delivery.

Meanwhile, the December 16 deadline for delivery slipped past. When it

did, Abad repeated that the work would finish soon, this time by January—but

Abad had no personal knowledge that the project was near completion. In reliance

on Abad's statements, Jean Tshiumba from the DRC Civil Aviation Authority and technical engineer Zacharie Nakwaya departed to inspect the 707 and collect it from ACG.

But when Tshiumba and Nakwaya arrived in Miami on January 10, 2011, their hopes were dashed.  As he inspected the replacement engines, Nakwaya found that 402 was completely disassembled and that 706 was closed and unserviceable.  Both were choked with dust and nests.  Furthermore, the engines were configured for a DC8 airplane, not for a Boeing 707, which meant installation would take longer than anticipated.  And Tshiumba, for his part, reported that the engines were not mounted and there was "no avionics equipment installed" on the aircraft.  The plane was unfit to fly, despite Abad's earlier assurances.

**D. The Liens and the Audit**

On April 21, Abad sent Deschryver more bad news.  Bonus Tech, the company servicing the plane's original engines, had filed a lien on the engines for $147,861.42.  A few weeks later, Abad reported that Commercial Jet, Inc., which was performing the C-check, planned to file its own lien on the plane.  The news irked Deschryver, because the DRC had already paid $5 million for the repairs, and Abad kept "on telling [Deschryver] that the aircraft [was] ready."  The DRC forked over another $1,381,531.64 to keep the work going.

6

The constant pleas for money prompted Deschryver to order an audit of the project.  On May 27, he asked Nakwaya and Ben Kalala, a deputy logistical assistant, to review the project's progress and finances.  Nakwaya and Kalala asked for notarized invoices from each vendor to verify the amount paid for services provided.  In response, Antonio Neuman furnished a contract between ACG and ABX for engines 402 and 706.  Unlike the contract signed in November 2010, however, the contract provided in May was signed by Abad, not Neuman.  And while the November contract said each engine cost $49,500, the May contract said each engine cost $57,000.  Apparently, ACG had given the DRC false statements to inflate actual costs.

### E. The Failed Flight Test and the Rejected Engines

By September 2011, President Kabila's plane was finally ready for a test flight.  Or so they thought.  During the test, after the plane had ascended to 24,000 feet, engine 402 stopped, or "flamed out."  Nakwaya also noticed that the plane was leaking fuel and that the generators were dead.  In Nakwaya's opinion, the 707 was in worse shape now than when the plane touched down in Florida in July 2010.

After the failed test, the parties gathered to discuss next steps.  At first, Abad promised to fix engine 402 at his own cost, but later, after Nakwaya found

corrosion and other damage in the engine, the DRC chose to reject it.  ACG kept engine 402 for its inventory.

Then in December, the parties met to discuss engine 706.  While moving to a new facility, the company servicing 706, the Turbine Engine Center, had misplaced the engine's records.  The DRC had requested the records since June, and they now threatened to reject 706 unless the documents turned up within 48 hours.  The DRC rejected the engine when ACG failed to find the records in the time allotted.

## F.  The Lawsuit

The DRC lodged a civil complaint against ACG, Abad, and others on February 14, 2012.  Six counts were alleged, including fraudulent inducement, breach of contract, fraud in the purchase and repair of engines 402 and 706, fraud in the purchase and installation of Stage III hush kits (to quiet engine noise), a violation of the FDUTPA, and replevin.  The trial began over a year later on July 2, 2013.

At trial, expert witness John Zappia testified about damages.  As part of his testimony, he presented a chart listing twenty-six line items.  In lines 4 through 23, part of 24, and 26, Zappia recounted the costs of ACG's alleged breach of contract.  The estimated damages from the breach totaled $1,175,415.04.

Zappia also testified about damages from the replacement engines, comprising lines 1 through 3 and 25 of the chart.  Included in this estimate were: (1) the costs of repairing engine 706 ($121,676.15); (2) the costs of repairing engine 402 ($151,691.92); (3) the cost of the failed test flight, which would need to be performed again ($85,969.66); and (4) the purchase price of engines 402 and 706, which ACG still held ($1,178,048.50).[2]  Zappia also recommended a recovery of $2,204,810.45 under the FDUTPA, consisting of items 1−2, 5−15, 17−23, and 25 of the damages summary.  For each of these items, Zappia said he calculated the amount based on "the difference between the value of the product or service that DRC paid for and the value of the product or service that they received."

At the close of the evidence, defendants moved for judgment as a matter of law.  The court denied the motion.  Then, on July 31, the court instructed the jury regarding liability and damages.  When addressing the FDUTPA, the court explained that the statute allowed only actual damages, or "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition it should have been delivered according to the agreement of the parties."  The court did not instruct the jury regarding the apportionment of damages between defendants.

---

[2] Zappia testified that the total damages from the replacement engines was $540,755.83. It is not clear where Zappia got this number, as the sum of lines 1−3 and 25 is $1,537,386.23.

The jury returned a verdict on August 1, 2013. ACG was held liable for breach, and the jury awarded the entire amount Zappia recommended on that claim ($1,175,415.04). They also held ACG and Abad liable for fraud regarding the replacement engines. On the verdict sheet, the jury wrote that ACG had to pay $362,707.03, plus plaintiff could "pick up [the] engines" from ACG. The jury also found ACG and Abad liable for a FDUTPA violation, and they awarded $720,848.04 from ACG on that count. The jury exacted no monetary damages from Abad on the fraud and FDUTPA claims.

Later that month, the DRC moved to alter the judgment. Plaintiff argued that although the jury demanded no damages from Abad, ACG and Abad were jointly and severally liable on the engine fraud and FDUTPA claims.

Defendants filed a motion of their own, but for remittitur and renewed judgment as a matter of law. They argued that plaintiff could not recover under FDUTPA because Zappia had not established the difference between the market price of contracted-for services and the value the DRC actually received. They also claimed that the FDUTPA award constituted a double-recovery because it included line items from both the breach and fraud claims.

On March 19, 2014, the court granted the DRC's motion to amend the judgment and denied ACG's motion for judgment as a matter of law. This appeal followed.

## DISCUSSION

The defendants now attack multiple components of the result below, from the cornerstone of jurisdiction to cupola of damages apportionment. We reject each argument and affirm in full.

### I.    The DRC Has Constitutional Standing to Bring Its Claims

To begin, defendants allege that the trial court lacked jurisdiction to try the case. Citing quotes sprinkled throughout the record, they suggest that the DRC government—the plaintiff here—has nothing to do with the DRC's Office of the President and Joseph Kabila, who owns the 707. If this were true, then the DRC would lack a stake in the litigation, and the court would have to dismiss the case for want of constitutional standing.[3]

We find defendants' cherry-picked political theory too fragile to support the argument. We agree, of course, that the Constitution extends the federal judicial power only to controversies between real parties in interest. *See* U.S. Const. art. III, § 2. Courts cannot decide claims where plaintiffs have suffered no invasion of a legally protected interest, or injury in fact. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560−61 (1992); *Houston v. Marod Supermkts., Inc.*, 733 F.3d 1323, 1328−29 (11th Cir. 2013). But here, plaintiff more than proved that it suffered an

---

[3] "We review *de novo* basic questions concerning our subject matter jurisdiction, including standing." *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir. 2008).

injury respecting its breach, fraud, and FDUTPA claims. *See Lujan*, 504 U.S. at

561 (holding plaintiff at final stage must prove standing with facts "supported

adequately by the evidence adduced at trial"). A review of the record shows how.

First, the evidence establishes that the DRC is a party to the Workscope

Agreement. The name "Republic Democratic of Congo" stands in capital letters

above the Agreement's signature block, and the same name pervades the rest of the

document. More importantly, the record attests that Charles Deschryver had

authority to sign the contract on the DRC's behalf. When he approved the

Workscope, Deschryver stamped the seal of the Office of the President over his

name. Deschryver further testified that the president is part of the DRC's

executive branch, together with the prime minister and his government. As an

agent of the state, Deschryver could enter into agreements for the DRC as long as

the principal retained control over his actions. *See Fla. State Oriental Med. Ass'n,*

*Inc. v. Slepin*, 971 So. 2d 141, 145 (Fla. Dist. Ct. App. 2007) (outlining tests for

actual and apparent authority of agents). We find nothing to suggest that

Deschryver departed from his instructions when he arranged to repair the 707. As

a consequence, the DRC was bound to the Workscope and is eligible to sue for

breach.

Second, the parties stipulated that the DRC paid for all work performed.

The record fully supports this fact. For instance, Antonio Neuman testified that

ACG billed the DRC, not the Office of the President, for tasks completed under the Workscope.  Deschryver added that the DRC's Ministry of Finance paid for the repairs.  And Kalala confirmed the point, testifying that the Office of the President liaised with the Ministry of Finance to wire a $1.36 million tranche to ACG in May 2011.  This evidence demonstrates plaintiff's financial stake in the claims on appeal.[4]

In response, ACG gathers snippets implying that the Office of the President and the DRC government are unrelated.  Yet these scraps of evidence, read in context, do little to confirm defendants' theory.  For example, Tshiumba testified that President Kabila's fleet of planes "is the same as companies like Hewa Bora," the private airline.  ACG cites this as proof that the Office of the President and the government are separate, but this is not Tshiumba's testimony.  By comparing presidential aviation to a private company, Tshiumba meant that the president is free to choose where to service his fleet, just like a private airline.  ACG also quotes Deschryver, who said that "[he] was . . . employed not by the government, [but] by the Office of the President, because the Office of the President and the government [are] different."  But Deschryver, like Tshiumba, was not teaching

---

[4] Plaintiff also touts a stipulation which supposedly confirms that the DRC was a party to the Workscope.  While we agree that plaintiff had standing to bring its claims, the DRC reads too much into the stipulation.  The stipulation says, "The contract for maintenance of the Aircraft between [ACG] and the [DRC] is dated June 21, 2010, but actually was executed in July, 2010."  This sentence aims to establish the date of the Workscope, not to identify the parties to the contract.

civics from the stand.  He distinguished between the Office of the President and the government to clarify who paid him when he worked at Hewa Bora, and in all likelihood, Deschryver used the term "government" to refer to the prime minister's cabinet, not the state apparatus as a whole.  None of defendants' citations oust plaintiff from our jurisdiction.

Defendants also argue that because Kabila owned the 707, the DRC has no interest in the outcome of the dispute.  In their words, "the aircraft involved in this lawsuit has as little to do with the [DRC] government as President Obama's golf cart does with respect to governmental property."  But perhaps ACG forgets that people can (and often do) agree to buy services for third-party beneficiaries.  *Cf. Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co.*, 215 F.3d 1217, 1222 (11th Cir. 2000) ("Contracts bind only named parties unless both parties to the contract clearly express an intent to benefit a third party.").  The DRC earned its berth in court by contracting for services that were never delivered, whether or not Kabila owned the plane.

The DRC has constitutional standing to bring its breach, fraud, and FDUTPA claims.

## II.    The DRC Has Statutory Standing to Bring an FDUTPA Claim

Next, ACG attacks plaintiff's statutory right to bring an FDUTPA claim. The FDUTPA bans "unfair or deceptive acts or practices in the conduct of any

trade or commerce," *see* Fla. Stat. § 501.204(1), and as defendants understand the

law, only "consumers" qualify for FDUTPA protection.  Because the DRC is a

sovereign government—not your ordinary market participant—ACG reasons that

plaintiff is not a "consumer" entitled to FDUTPA safeguards.[5]

We do not accept defendant's restrictive reading of the law.  When

explaining the statute's rules of construction, the Florida legislature urged courts to

construe the law "liberally to . . . protect the consuming public and legitimate

business enterprises from those who engage in . . . unconscionable, deceptive, or

unfair acts."  Fla. Stat. § 501.202(2).  To achieve this goal, the statute originally

extended relief to "consumers," *id.* § 501.211(2) (2000), that is, any "individual . . .

firm; association; joint venture; partnership; estate; trust; business trust; syndicate;

fiduciary; corporation; or *any other group or combination*," *id.* § 501.203(7)

(emphasis added).  Then in 2001, the legislature revised the statute to ensure that

businesses received the same protections as individual consumers.  Senate Staff

---

[5] The DRC claims we should ignore this issue because ACG did not raise it below, and defendants counter that the matter is jurisdictional and not subject to waiver.  The DRC might be right.  Not long ago, the Supreme Court held that statutory preconditions to suit are "jurisdictional" (and hence immune to waiver) only if "the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006).  A statutory limitation is not jurisdictional "when [the Legislature] does not rank a statutory limitation . . . as jurisdictional."  *Id.* at 516; *see also In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035, 1042−46 (11th Cir. 2008) (holding law requiring three or more creditors to petition for involuntary bankruptcy was not jurisdictional).  Here, it seems the Florida legislature did not expressly condition jurisdiction on plaintiff's consumer status, so we doubt ACG's argument was unsusceptible to waiver.  *See* Fla. Stat. § 501.211(2).  We decline to decide the issue in any event because the briefing on the matter was thin, and because the DRC had a right to sue under the FDUTPA.

Analysis, CS/SB 208, Mar. 22, 2001, at 3 ("Because the remedies under the FDUPTA [sic] were intended by the Legislature to be available to all persons, including businesses, the Legislature has several times amended the definition of 'consumer' in the FDUTPA to clarify the intent to include businesses."). The law now allows "*a person* who has suffered a loss as a result of a violation" of the FDUTPA to recover "actual damages, plus attorney's fees and court costs." Fla. Stat. § 501.211(2) (emphasis added).

Courts have interpreted the new provision generously, but not consistently. One line of cases—the more conservative view—extends FDUTPA protection only to persons who were deceived when buying or selling goods and services. In *Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348–50 (S.D. Fla. 2009), for example, plaintiff sued a website operator who posted lewd photos of the plaintiff without her consent. The court held that plaintiff lacked standing because she was not injured in a market transaction between the parties. *Id.*; *see also Cannova v. Breckenridge Pharm., Inc.*, No. 08-81145-CIV, 2009 WL 64337, at *3 (S.D. Fla. Jan. 9, 2009) (denying FDUTPA claim alleging plaintiff's employer violated post-termination agreement); *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-cv-947-J-33HTS, 2008 WL 2950112, at *8–9 (M.D. Fla. July 31, 2008) (denying FDUTPA claim alleging defendant failed to fulfill obligations under performance bond); *Badillo v. Playboy Entm't Grp., Inc.*, No.

8:04CV591T30TWM, 2006 WL 785707, at *6 (M.D. Fla. Mar. 28, 2006) (denying

FDUTPA claim alleging defendant used lewd photos of plaintiffs without consent).

Another line of cases, the permissive view, extends FDUTPA protection to

any person injured by a deceptive or unfair practice, regardless of whether she

sustained the injury in a sale or purchase.  In *Hinson Electrical Contracting Co. v.*

*Bellsouth Telecommunications, Inc.*, No. 3:07-cv-598-J-32MCR, 2008 WL

360803, at *1 (M.D. Fla. Feb. 8, 2008), for instance, plaintiff broke defendant's

underground lines in an excavation, and defendant overbilled plaintiff for the

damage.  The court found plaintiff had standing under the FDUTPA because he

suffered an unfair and deceptive act in the course of commerce.  It did not matter

that he purchased nothing of value from the defendant.  *Id.* *3; *see also Furmanite*

*Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1145−47 (M.D. Fla.

2007) (denying summary judgment on FDUTPA claim alleging defendants

resigned *en masse* from plaintiff's employ).

We need not referee this interpretive tussle.  Even if we adopted the former

view—that plaintiffs have FDUTPA standing only if they are injured in a purchase

or sale—the DRC can still sue.  Though it is a sovereign state, the DRC acted like

a private airline when it contracted with ACG to perform the C-check and replace

two engines.  It signed a standard work agreement, and it paid ACG over $6

million to do the job.  We see no reason why standing should not extend to

government bodies when they engage in consumer transactions the way private

actors do.  *Cf. White v. Mass. Council of Constr. Emp'rs, Inc.*, 460 U.S. 204,

214−15 (1983) (denying Commerce Clause claim where city hired mostly Boston

residents for city-funded construction projects).

　　　The defendants rejoin that the FDUTPA precludes governments from filing

private suits.  In one provision, the statute permits the "enforcing authority" (i.e.,

the state attorney or Department of Legal Affairs) to bring an action "on behalf of

one or more consumers or *governmental entities* for the actual damages caused by"

a FDUTPA violation.  Fla. Stat. § 501.207(1)(c) (emphasis added); *see also id.*

§ 501.203(2).  Another provision lets a "person" sue for damages but does not

expressly give governments a private right of action.  *Id.* § 501.211(2).  In ACG's

view, the *inclusion* of government bodies as interested parties in suits by Florida

authorities, and the *exclusion* of government bodies as plaintiffs in private suits,

effectively bars entities like the DRC from bringing their own FDUTPA cases.

　　　We disagree.  The interpretive maxim that ACG implies, *expressio unius est*

*exclusio alterius*, does not block the DRC from filing FDUTPA claims.  Translated

from Latin, the phrase means "to express or include one thing implies the

exclusion of the other."  *Black's Law Dictionary* 701 (10th ed. 2014).  In other

words, if the legislature grants a right or privilege in only one situation, one may

infer that the legislature withheld the right or privilege elsewhere.  But as the

Supreme Court has explained, *expressio unius* arguments "ha[ve] force only when the items expressed are members of an associated group or series, justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (internal quotation marks omitted). And here, no such inference is justified. The FDUTPA extends its aegis to "persons," a cavernous term that could easily include government bodies acting in the market. *See* Fla. Stat. § 501.211(2). What is more, the statute's rules of construction compel courts to interpret the law liberally. *Id.* § 501.202. Given the statute's broad language and sweeping purpose, we doubt the legislature meant to deny private suits by public entities.

The DRC has standing to sue under the FDUTPA.

## III.   The Jury Reasonably Held ACG Liable for Violating the FDUTPA

In its next challenge, ACG shifts focus from jurisdiction to the merits. At trial, the jury held defendants liable on a number of counts, including the FDUTPA claim. ACG now argues that the jury erred to do so, because the DRC's representatives were too sophisticated to fall for defendants' deceits.[6]

This argument builds on a flawed understanding of the statute. As noted before, the FDUTPA bans "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). By claiming that plaintiff was

---

[6] The court must uphold the jury's verdict unless there is no "legally sufficient evidentiary basis to find" for the DRC. Fed. R. Civ. P. 50(a).

too savvy to be swindled, defendants imply that the statute espouses a subjective

standard of deceit—that is, they would hold a defendant liable only if the victim

suffered harm in actual reliance on a deceptive act or practice.  But this is not the

law.  A FDUTPA claim, unlike a claim for fraud, requires proof that defendant's

act would likely "mislead the [objective] consumer acting reasonably in the

circumstances."  *See PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777

(Fla. 2003) (quoting *Millennium Commc'ns & Fulfillment, Inc. v. Office of Att'y

Gen.*, 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000)); *Davis v. Powertel, Inc.*,

776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000) ("The plaintiff need not prove the

elements of fraud to sustain an action under the statute.").  No proof of subjective

reliance is needed.

The court identified an objective deception in *Cummings v. Warren Henry

Motors, Inc.*, 648 So. 2d 1230 (Fla. Dist. Ct. App. 1995).  There, the defendant

purported to sell plaintiff a car to be paid off in sixty months.  In reality, defendant

only leased the car for sixty months, and at the end of the term, the vehicle would

not be paid off.  *Id.* at 1233.  The court held that this "bait and switch" tactic was

unfair and deceptive under the FDUTPA.  *Id.*  Federal courts ruled similarly when

a chewing gum company wrongly claimed that its product killed germs, *Smith v.

William Wrigley Jr. Co.*, 663 F. Supp. 2d 1336, 1337−40 (S.D. Fla. 2009), when a

manufacturer misrepresented that its vacuum cleaners were fit for use, *Hill v.*

*Hoover Co.*, 899 F. Supp. 2d 1259, 1263−64 (N.D. Fla. 2012), and when a producer misstated that its products were wheat and gluten free, *Nature's Prods., Inc. v. Natrol, Inc.*, 990 F. Supp. 2d 1307, 1322 (S.D. Fla. 2013).

By contrast, the court found no deceit in *Millennium Communications*, 761 So. 2d at 1263−64, where defendant told consumers that they qualified for credit cards with a $4000 limit. The Florida Department of Legal Affairs sued, claiming that defendant led consumers to believe they could get a MasterCard or Visa despite their past credit troubles. The court rejected this claim on a motion to dismiss, because a reasonable consumer was unlikely to conclude from defendant's statements (which did not mention Visa or Mastercard) that he qualified for a Visa or MasterCard. *Id.*; *see also Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565, 567−68 (11th Cir. 2009) (denying FDUTPA claim where plaintiff relied on statement by franchisee who lacked authority to speak on defendant's behalf); *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284−85 (11th Cir. 2007) (denying FDUTPA claim where real estate reservation contract clearly stated that it was not a purchase agreement).

Like the courts in the cases above, we define deception objectively. We also find ample proof of conduct that would deceive a reasonable consumer in the DRC's circumstances. In September 2010, for example, Deschryver asked Abad to buy two 707 engines for the plane, "with all the documents, QEC, all the AD

and all the airworthiness directives and all the service in order." Abad purchased the engines, but they were configured for a DC8 aircraft, and neither was serviceable upon delivery. Abad also promised to deliver the plane in December 2010 and January 2011, but the deadlines passed without explanation. Instead, Abad hustled the DRC for more money and let subcontractors file liens on the plane, despite earlier assurances that the work was done. And perhaps worst of all, when Nakwaya and Kalala requested invoices from vendors, ACG furnished a contract listing the price of each replacement engine at $57,000. In the original contract with ABX, the price for each engine was only $49,500, which suggests that ACG kept double books to inflate the DRC's costs. Given this record of misstatements, broken promises, and lies, we have little trouble holding that ACG's conduct would deceive the reasonable consumer.

Defendants answer by citing *Black v. Department of Legal Affairs*, 353 So. 2d 655, 656 (Fla. Dist. Ct. App. 1977), and *Golden Needles Knitting & Glove Co. v. Dynamic Marketing Enterprises, Inc.*, 766 F. Supp. 421, 430 (W.D.N.C. 1991). They claim that these cases require subjective proof of deception to justify a recovery under the FDUTPA, but we do not read the cases that way. When these opinions were published, the statute covered only consumer transactions, defined as "a sale . . . or other disposition of an item of goods . . . to an individual . . . that relate to a business opportunity that requires both his expenditure of money or

property and his personal services on a continuing basis and in *which he has not been previously engaged*."  *Black*, 353 So. 2d at 656 (emphasis added) (citing Fla. Stat. § 501.203(1) (1975)).  In other words, a plaintiff could not secure FDUTPA relief if he knew the defendant's business well enough to manage the risk.  *See id.*; *Golden Needles*, 766 F. Supp. at 430.  But in 1993, the Florida legislature struck this definition of "consumer transaction" and extended protection to any transaction in "trade or commerce," even if plaintiff was familiar with the defendant's craft.  *Tampa Bay Storm, Inc. v. Arena Football League, Inc.*, No. 96-29-CIV-T-17C, 1998 WL 182418, at *7 (M.D. Fla. Mar. 19, 1998).  The law now permits recovery if the plaintiff proves she was injured by an objectively deceptive act or statement, and as we said before, the DRC more than satisfies this standard.[7]

We sustain the verdict finding defendants liable under the FDUTPA.

## IV.   The DRC Presented Proper Evidence of FDUTPA Damages

Defendants' remaining arguments zero in on the damages awarded at trial. ACG first claims that expert witness John Zappia gave improper testimony about plaintiff's losses under the FDUTPA.  The statute permits parties to recover actual

---

[7] Some courts have injected a subjective element into FDUTPA claims for unfair practices.  *See In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices*, 715 F. Supp. 2d 1265, 1277−80 (S.D. Fla. 2010) (denying certification because lawyers could avoid unfair court-reporting fees better than other class members); *Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096−1100 (Fla. Dist. Ct. App. 2014) (denying certification because some class members could avoid buying easily purloined headlights better than other class members).  We base our holding on ACG's deceptive acts, however, and deception is judged from an objective point of view.  *See PNR*, 842 So. 2d at 777.

damages—or the difference between a product's value under the contract and the market value of the product delivered—but defendants say Zappia failed to analyze market values to measure the loss. ACG would exclude the expert testimony and vacate the $720,848.04 FDUTPA award as unsupported in evidence.[8]

We decline the defendants' invitation for two reasons. First, ACG waived its right to challenge Zappia's testimony on appeal. In general, if defendants fail to make an argument in a motion for judgment as a matter of law ("JMOL"), they may not raise the argument after the verdict in a renewed motion for judgment as a matter of law ("RJMOL"). *See* Fed. R. Civ. Proc. 50(a)−(b); *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 717 n.3 (11th Cir. 2002) ("If a party asserts new grounds in its [RJMOL] that it did not assert in its initial [JMOL], a court may not rely on the new grounds to set aside the jury's verdict." (internal quotation marks omitted)). Here, ACG attacked Zappia's damages estimate in the RJMOL but not the JMOL, so defendants cannot broach the issue now. Nor could they air the grievance through a motion to alter the judgment. Parties "cannot use a Rule 59(e) motion to . . . raise argument[s] . . . that could have been raised prior to the entry of judgment," and Zappia's testimony was open to challenge well before the jury

---

[8] Again, we sustain the jury's verdict unless there is no "legally sufficient evidentiary basis to find" for the DRC. Fed. R. Civ. P. 50(a). The court reviews the denial of remittitur for abuse of discretion. *Mason v. Ford Motor Co.*, 307 F.3d 1271, 1276 (11th Cir. 2002).

returned a verdict.  *Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763

(11th Cir. 2005).

Second, contrary to defendants' claim, Zappia's damages estimate fully

accorded with the law.  Under Florida Statute § 501.211(2), "a person who has

suffered a loss as a result of [a FDUTPA violation] may recover actual damages,

plus attorney's fees and court costs."  The statute does not define actual damages in

detail, but Florida courts agree on the following:

> Generally, the measure of actual damages is the difference in the
> market value of the product or service in the condition in which it was
> delivered and its market value in the condition in which it should have
> been delivered according to the contract of the parties.  A notable
> exception to the rule may exist when the product is rendered valueless
> as a result of the defect—then the purchase price is the appropriate
> measure of actual damages.

*Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. Dist. Ct. App. 1984) (quoting

*Raye v. Fred Oakley Motors, Inc.*, 646 S.W.2d 288, 290 (Tex. Ct. App. 1983).  In

short, plaintiffs must marshal evidence to prove the gap in value between what was

promised and what was delivered, *unless* defendant palmed off a product that was

truly worthless.  In the latter situation, plaintiff may recoup the full price he paid

for the valueless good or service.

*Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178 (Fla.

Dist. Ct. App. 2010), illustrates the general rule.  In that case, plaintiff bought a jet-

boat from the defendant.  Then one day, when plaintiff was out riding, the boat

"began to burn and eventually sunk." *Id.* at 179.  Defendant later repaired the jet-

boat, but plaintiff sued under the FDUTPA, requesting the return of her "down

payment, payments on the loan, interest, [as well as the] balance on the loan." *Id.*

The court denied the claim and explained that plaintiff could recover only "the

difference in the market value of the jet-boat as delivered and market value as it

should have been delivered."  *Id.* at 181; *see also Gastaldi v. Sunvest Resort*

*Communities, LC*, 709 F. Supp. 2d 1299, 1304−06 (S.D. Fla. 2010) (excluding

testimony where expert based damages on condo's adjusted purchase price instead

of market value).  Because the jet-boat retained some of its value, plaintiff could

not base damages on the purchase price.

In contrast, the court allowed plaintiff to use the purchase price as a proxy

for damages in *Tri-County Plumbing Services, Inc. v. Brown*, 921 So. 2d 20, 21

(Fla. Dist. Ct. App. 2006).  There, plaintiff paid the defendant to fix her plumbing,

but the repairs failed inspection, and defendant walked off the job before correcting

remaining defects.  *Id.*  The trial court awarded damages equal to the amount

plaintiff deposited with the defendant, and the appellate court affirmed.  The court

reasoned that defendant's repairs did nothing to complete the work assigned, so the

deposit price was the correct measure of FDUTPA damages.  *Id.* at 22.

The DRC's case falls within the *Tri-County Plumbing* exception to the

general rule.  We note, at the outset, that the jury compensated plaintiff completely

for ACG's breach of contract. Zappia recommended $1,175,415.04 in damages for breach, and the jury awarded just that amount. As a consequence, the only damages pertinent to the FDUTPA claim are those from the purchase and repair of the replacement engines. To recover these losses under the statute, plaintiff had to prove the difference in the market value of the products as promised and as delivered, or to prove that those products and services were worthless. *Id.* at 22.

Zappia's testimony achieved the latter. In items 1 through 2 of the damages summary, Zappia attributed a $273,368.07 loss to repair work done on engines 402 and 706. The job was to update the engine's anticorrosion ADs and extend their useful life, yet when Nakwaya reviewed the engines' records in June 2011, he found neither one had current ADs and both had only a short useful life remaining. Because defendants' work added no value, plaintiff can recover the entire price it paid for the repairs. *Id.*

The DRC also gave adequate proof of damages from the purchase of the engines. After the September 2011 test flight, plaintiff rejected engine 402 because it was corroded and had sustained impact damage. Abad held onto the engine for his inventory. Later that year, the DRC also rejected engine 706 because its records were missing. As Sanchez testified, an engine without documents must be replaced, and though ACG later found the records for 706, defendants never gave the engine to the DRC. Because it received nothing that it

27

paid for, the DRC may collect $1,178,048.50 for the engines, as Zappia recommended.[9]

Defendants respond that Zappia erred to list "specific items and claim[] these as [FDUTPA] damages, without ever looking at the value difference between an aircraft as delivered to [plaintiff] compared to one as [plaintiff] claims should have been delivered."  But defendants overlook that the DRC bought only a C check, engines, and hush kits from ACG—not a whole airplane.  Had plaintiff purchased an entire aircraft from ACG, and that aircraft had come with the defects listed in the damages summary, then the measure of damages would be the plane's market value as contracted minus the plane's value as delivered.  *See Rodriguez*, 38 So. 3d at 181.  But here, the DRC purchased discrete goods and services from ACG, and we measure damages against those items and not against the plane as a whole.

The evidence supports the jury's FDUTPA damages award, and the trial court did not abuse its discretion to deny remittitur.

**V.    The FDUTPA Award Was Not a Double Recovery**

Next, ACG argues that the FDUTPA damages awarded to plaintiff were a double recovery.  At trial, Zappia said the DRC should get $1,175,415.04 for

---

[9] It is less clear whether plaintiff could collect FDUTPA damages for the test flight. Though it ended in failure, the test achieved its central aim: to prove whether the 707 was airworthy.  Assuming the test had value, plaintiff could not collect the purchase price under the Florida statute.  The DRC could collect the price as part of the fraud award, however, so the error, if any, was harmless.

breach of contract, comprising lines 4 through 23, part of 24, and 26 of the damages chart.  He also recommended a $1,537,386.49 recovery for fraud related to the engines, corresponding to lines 1 through 3 and 25 of the chart.  In light of these estimates, ACG claims it was wrong to award FDUTPA damages under lines 1−2, 5−15, 17−23, and 25.  Each of these items was covered already in the breach or fraud counts, and defendants argue that the trial court erred to give a duplicative FDUTPA award.

We will not disturb the jury's decision, because despite appearances, the FDUTPA award was not actually duplicative.  To merit remittitur, the damages granted for breach, fraud, or other claims must exceed plaintiff's actual loss.  A court reduced an award, for example, where plaintiff proved $2,535,990.48 in damages for breach and fraud arising from the same incident.  The jury awarded $1,372,700 and $2,745,400 on each count, but the court whittled the total award to $2,535,990.48 to ensure plaintiff did not receive more than his actual loss.  *See Novak v. Gray*, 469 F. App'x 811, 812−13, 816−18 (11th Cir. 2012).

On the other hand, a plaintiff may recover damages on two claims stemming from the same conduct if the total does not exceed actual damages.  In *Coquina Investments v. Rothstein*, No. 10-69786-Civ, 2012 WL 4479057, at *1 (S.D. Fla. Sept. 28, 2012), plaintiff sued defendant for fraudulent misrepresentation and for aiding and abetting a Ponzi scheme.  At trial, plaintiff proved that it lost $37.7

million in the scheme.  *Id.* at \*20−21.  The jury then rendered a verdict for $32 million: $16 million for the misrepresentations, and another $16 million for the aiding and abetting.  In a motion for remittitur, defendant argued that the award was a double recovery because the misrepresentation and aiding and abetting claims comprised the same conduct.  Yet the trial court refused to reduce the award, because $32 million was well within the total damages proven at trial.  *Id.* This court affirmed.  *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1319 (11th Cir. 2014); *see also Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 154 (2d Cir. 1991) ("[D]efendants do not demonstrate that a jury's award is duplicative merely by noting that it allocated the damages under two different causes of action.").

We affirm here too, because plaintiff's recovery did not exceed its actual loss.  As mentioned before, the DRC proved $1,175,415.04 in damages from lines 4 through 23, part of 24, and 26 of the damages chart, and the jury awarded exactly that amount on plaintiff's breach claim.  The DRC also proved $1,537,386.49 in damages from lines 1 through 3 and 25 of the chart, corresponding to the fraud regarding the replacement engines.  Here, however, the jury granted only $362,707.03 in damages and added that plaintiff could "pick up" the engines from ACG.  The latter remedy was unauthorized, though, and when instructed by the court to recalculate the fraud award, the jury refused to give anything more.

Plaintiff ultimately received a sum for its fraud claim that was $1,174,679.46 less than the estimate.

In light of *Coquina*, we hold that the $720,848.04 FDUTPA award was a permissible supplement to the fraud recovery.  While it is possible, as defendants allege, that the jury found $362,707.03 in fraud damages and granted the $720,848.04 FDUTPA award as double damages for breach, they could just as easily have awarded the $720,848.04 to round out the fraud recovery.  In any event, the total amount conferred on the breach, fraud, and FDUTPA claims ($2,258,970.11) was less than the total loss proven at trial ($3,423,718.32). Because this sum stayed within range of the damages proven, the trial court did not abuse its discretion to deny remittitur.  *Coquina*, 2012 WL 4479057, at *1.  We sustain the jury's FDUTPA verdict as lawful and grounded in evidence.

## VI.    The Trial Court Correctly Imposed Joint and Several Liability

Finally, Abad argues that the trial court erred to hold defendants jointly and severally liable on plaintiff's fraud and FDUTPA claims.  On the verdict form, the jury wrote that both ACG and Abad were liable for fraud and FDUTPA violations. Yet when it came to deciding damages, the jury said only ACG had to pay the debt, leaving Abad with no personal obligations to the plaintiff.  The court later shifted the damages to ACG and Abad jointly and severally, and defendants say this was contrary to the jury's wishes.

We again sustain the trial court.  Under Federal Rule of Civil Procedure 60(a), courts may modify a jury verdict to correct "a clerical mistake . . . in a judgment."  The rule does not permit the revision of a jury's factual findings, but courts may adjust a verdict to comply with rules regarding the apportionment of damages.  *Stuckey v. N. Propane Gas, Co.*, 874 F.2d 1563, 1574 (11th Cir. 1989).

Here, apportionment is governed by state law.  In Florida negligence cases, courts allocate liability among defendants based on each "party's percentage of fault and not on the basis of the doctrine of joint and several liability."  Fla. Stat. § 768.81(3).  Yet in actions concerning intentional torts, the doctrine of joint and several liability still applies.  *See id.* § 768.81(4); *Meyer v. Thompson*, 861 So. 2d 1256, 1258 (Fla. Dist. Ct. App. 2003).  And when a corporate defendant is held vicariously liable for the intentional torts of an individual, the doctrine works with greater force.  In such situations, it is impossible to compare fault between parties because the corporation is liable for all harm caused by the primary actor.  *See Grobman v. Posey*, 863 So. 2d 1230, 1235−37 (Fla. Dist. Ct. App. 2003) (refusing to compare liability where HMO vicariously liable for acts of doctor).

In view of this law, the trial court did not err to divide liability jointly and severally among ACG and Abad.  In its final instructions, the court explained the legal tests for fraud and FDUTPA claims, but it did not explain how to apportion damages between the defendants.  Left to their own devices, the jury distributed

liability as they saw fit, perhaps exacting the award from the defendant best equipped to bear the costs.  But even if that was the jury's reasoning, the rationale contravened clearly established law.  The court did not exceed its authority to correct this error on motion, reallocating the damages to the right parties in the right amount.

ACG counters that the court could not modify the verdict because it was the jury's "obvious, but unexpressed" intent to exempt Abad from paying damages. Though the jury marked Abad liable for fraud and FDUTPA infractions on the verdict form, they did not take damages from him; this meant, in defendants' estimation, that the jury held Abad liable on accident.  But the court did not abuse its discretion to take a contrary view of the evidence.  By marking that Abad was liable on both counts, the jury probably intended to hold Abad responsible for his misrepresentations.  That the jury required no money from Abad proves only that they misunderstood how Florida law allots damages from intentional torts.

## CONCLUSION

After reviewing the briefs and the record with care, we affirm the judgment below in all respects.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
## Bill of Costs

Court of Appeals Docket No. __14-11243__

__Democratic Republic of the Congo__  vs.  __Air Capital Group LLC, et al.__

A Bill of Costs should only be filed when the Clerk's Office has advised a party that the party is entitled to costs. FRAP 39 and 11th Cir. R. 39-1 govern costs taxable in this court and the time for filing the Bill of Costs. A motion for leave to file out of time is required for a Bill of Costs not timely received.

## INSTRUCTIONS

In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced. Multiply this number by the cost per copy ( $.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| DOCUMENT | Repro. Method (Mark One) | | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|
| | In-House | Comm* | | | | | |
| Appellant's Brief | | | | | | | |
| Appendix | | x | 2280 | 8 ✓ | 18,240 | $2006.40 | 2,006.40 |
| Appellee's Brief | | x | 60 | 9 (7) | 540 | $59.40 | 46.20 |
| Reply Brief | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | | | **TOTAL** | | $2065.80 REQUESTED | $ 2,052.60 ALLOWED |

I hereby swear or affirm that the costs claimed were actually and necessarily incurred in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Signature: _Raquel Fernandez_                    Date Signed: _6/24/2015_

Attorney Name: __Raquel M. Fernandez__            Attorney for: __Democratic Republic of the Congo__
(Type or print your name)                          (Type or print name of client)

E-mail: __rfernandez@cozen.com__                  Phone: __305-704-5943__

Street Address/City/State/Zip: __200 South Biscayne Blvd. Suite 4410, Miami, FL 33131__

---

## FOR COURT USE ONLY

Costs are hereby taxed in the amount of $ __# 2,052.60__ against _Appellants_

and are payable directly to _____ _Appellee_

Douglas J. Mincher, Clerk of Court

Issued on: _____   By: _Tena Porter_   DATE: _7/8/2015_
Deputy Clerk

BOC Rev.: 3/15

ISSUED AS MANDATE 01/07/2016